775 A.2d 430

**Sarah FRIED, et al.,**

**v.**

**Kim ARCHER, et al.**

**No. 0912, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

July 3, 2001.

230

232

234

Clifford L. Hardwick (Hardwick & Harris, LLP, on the brief), Baltimore, for appellants.

Philip S. Roberts (A. Frank Craven, III, on the brief), Bel Air, for appellees.

Argued before ADKINS and CHARLES E. MOYLAN, Jr. (Retired, Specially Assigned), JAMES, S. GETTY (Retired, Specially Assigned), JJ.

ADKINS, Judge.

Fifteen year old Tiffany Fouts, daughter of Sarah Fried, appellant, paid far too high a price for drinking alcohol. At a residence she was visiting for the first time, Tiffany got drunk

in the company of her girlfriend and four underage boys she had just met. Tiffany became ill and semi-conscious. Some of the guests sexually assaulted Tiffany, then dragged her outside in the freezing rain. In an effort to avoid legal trouble but summon a rescuer, three of them called the Harford County Sheriff's Department. They reported to police communications officer Kim Archer, appellee, that there was a girl who had been "over here drinking" laying in the woods to the rear of "1436" Harford Square, "K Court." Archer replied that she would "send someone out."

Unfortunately, in order to prevent police officers from coming to their residence at 1443 Charleston Drive, K Court, the assailants hastily invented a street number, and insisted on anonymity. Unfortunately, there is no 1436 K Court, because K Court only has odd-numbered addresses. Unfortunately, the dispatcher directed the responding police officers to "1436 .... *J* Court," an address that does exist. Unfortunately, despite searching behind that address and the entire row of townhomes along J Court, the officers did not find Tiffany, and discontinued their search. Unfortunately, no search was conducted in the woods behind the K Court townhomes, where Tiffany lay until she was found the next day, dead from hypothermia.

In this appeal, we address an issue of first impression in Maryland—the negligence liability of a police dispatcher. We conclude that the tort duty owed by police dispatchers must be determined by applying the same "special duty rule" that governs the tort liability of other public and private defendants. Applying that rule, we hold that Archer did not have a special duty to rescue Tiffany, because Tiffany, who was unconscious, did not specifically rely on Archer's promise to "send someone out," and because the assailants who called on her behalf did not justifiably rely on that promise. Thus, Archer did not have a "special relationship" with Tiffany, or a special duty to aid, protect, or rescue Tiffany. Because appellant cannot establish that Archer had a private duty to Tiffany, the trial court properly dismissed appellant's negligence claims against Archer. For substantially similar reasons, we

also affirm the dismissal of appellant's negligent training claims against James Terrell, appellee, who is chief of Harford County's Emergency Management and Operations Division.

## FACTS AND LEGAL PROCEEDINGS

■ We review the allegations in the complaint, and accept them as true for purposes of reviewing this dismissal. *See Valentine v. On Target, Inc.*, 353 Md. 544, 548, 727 A.2d 947 (1999). On November 11, 1995, Tiffany Fouts made plans to spend the night with her school friend, Melanie M. Early in the evening, the two girls went to 1443 Charleston Drive, K Court, located in the Harford Square townhome development in Edgewood. This was the home of Melanie's acquaintance, Eric F., and his mother, Ms. F. Tiffany, Melanie, and Eric were joined by three of Eric's friends, Donte, Ricky, and Louis. Tiffany had never met Eric or any of his friends.

The complaint alleges that Ms. F. and Louis supplied alcohol to the minors, who "partied" in the basement of Ms. F.'s home. Within an hour of her arrival, Tiffany began to vomit and lapsed into semi-consciousness. Some of the guests then assaulted and abused Tiffany. They "engaged in nonconsensual sexual acts with [her], heavy objects were dropped upon her head and certain guests urinated upon her as well."

To conceal Tiffany's condition, Eric F. and Ricky dragged her out a back door. They left Tiffany, wearing only a tee shirt, skirt, socks, and shoes, in an area of woods located directly behind the townhome. The weather was cold and rainy, and a snowy winter storm had been forecast.

Melanie and Louis then left the Fox residence. Ricky and Donte were staying the night with Eric. Aware that Tiffany was in danger from exposure, Donte, in the presence of Eric and Ricky, called the Harford County Sheriff's Department ("HCSO"). His report to Kim Archer, the police communications officer who answered the phone, was as follows:

HCSO DISPATCHER [ARCHER]: Harford County Sheriff's Office, PCO Archer.
CALLER: Hello.

HCSO DISPATCHER: Yes.

CALLER: Um, there's a girl in the back of the woods like.

HCSO DISPACTHER: Back of what woods.

CALLER: Um, Harford Square.

HCSO DISPATCHER: Okay. What's the exact address?

CALLER: There ain't no exact address where she's at.

HCSO DISPATCHER: Okay. What's the residence where she is? Can you give me the residence in front of where she's to the rear of?

CALLER: What's the address to those people over there? Cause she's further that way. 1436? (Inaudible.) 1436.

HCSO DISPATCHER: Okay. Harford Square?

CALLER: Yes, K Court.

HCSO DISPATCHER: Okay. And what's she doing, sir?

CALLER: Just laying there.

HCSO DISPATCHER: Okay. She's just laying to the rear of the house?

CALLER: Yes, she was. She was over a—. She was over here drinking and she was laying there.

HCSO DISPATCHER: Okay. Is she a white female? Black female?

CALLER: Yeah.

HCSO DISPATCHER: Which one?

CALLER: White female.

HSCO DISPATCHER: Okay. White female. Okay. And your last name, sir?

CALLER: I'd just say anonymous.

HCSO DISPATCHER: Okay. We'll send someone out.

CALLER: Thanks.

The complaint acknowledged that the boys, "[i]ntending for the emergency personnel to locate Tiffany Fouts, but attempting to avoid potential problems related to underaged drinking, ... provided ... a fictitious street address of '1436'," but asserted that they "provided a factually accurate street identification indicating [that Tiffany was] 'in the back of the woods'

on 'K Court'...." It asserted that Archer failed "to obtain further substantive information ... which would have been instrumental in successfully locating and rescuing Tiffany Fouts," and "misinformed the [HCSO] and/or Deputy Sheriff Kevin L. Thomas as to the proper location of the semiconscious girl...." The dispatcher directed responding officers to investigate "the well-being of a number 2 female ... lying to the rear of" "1436 Harford Square Drive.... J—John—Court," instead of "K Court."

These mistakes, appellant asserted, had fatal consequences. "The area behind J Court is separate and apart from K Court and located in a different section of the Harford Square townhome development." Appellant alleged that, unlike the area behind K Court, the area behind J Court "had no ... forested area." Officer Thomas walked the area behind the J Court townhomes, including number 1436, but did not find Tiffany. "[N]o further effort of any nature was made to review or request further information that had been provided to the dispatch office notwithstanding ... the pouring rain and approaching winter storm...." In the early morning hours of November 12, Tiffany Fouts froze to death.

Appellant filed a wrongful death and survival action against Ms. F., PCO Archer, "unidentified dispatch or emergency service employees of Harford County Emergency Operations Division" (the "Doe defendants"), Officer Thomas, Chief Terrell, the HCSO, and the State.[1] She alleged that "Archer [negligently] breached her duty of care by failing to make basic inquiries of Donte W." by "reporting that Tiffany ... was behind 'J' Court when in fact she was reported to be and was in fact behind 'K' Court," and by "failing to report that Tiffany ... was behind townhomes near a forested area, ... [a] crucial piece of initial information [that] would have assisted in the determination that an improper address had been provided by Archer [and prompted] .... [a] review of the recorded telephone call...." The negligence claims against

---

1. Only Archer and Terrell are parties to this appeal.

Terrell were based on allegations of improper procedures and training for emergency dispatchers.

After appellant voluntarily dismissed Ms. F., all of the governmental defendants moved to dismiss the negligence claims against them. In support, they offered transcripts from the juvenile criminal proceedings against Eric F., which included a transcript of Donte's call to Archer.

Donte testified that he knew Tiffany "was cold," and suggested calling the police on her behalf. That suggestion and other suggestions to call for an ambulance and to call 911 were overruled, in favor of calling the HCSO directly. The three looked up HCSO's number in a local telephone directory, and Donte placed the call. Eric supplied him with the house number "1436." Donte requested anonymity because he "didn't ... want them to come to the house." After the call, they "hit the lights .... [so] they won't come to the house." They briefly peeked out the window blinds, looking "for flashlights," but then returned to the basement.

Eric testified that he vetoed Donte's suggestion to call 911, because he "knew it would be a whole bunch of like police cars and stuff, and I didn't want them coming to the house." He admitted that for the same reasons, he invented a street address: "I didn't want to give [Donte] the address to this house .... so I thought of an address I thought it was close to ... where she was at." After calling HCSO, Eric went back outside to check on Tiffany only "[o]nce." Although he and Ricky Washington planned to go outside a second time, and to bring Tiffany "back into the house and let her stay in the basement," his mother stopped them as they were going out the front door. She told Ricky he could go out if he wished, but he did not. Eric admitted that he never saw the police come.

Deputy Thomas testified that he was familiar with the Harford Square townhomes, from his frequent patrols of that neighborhood. Each of the courts off the main roads are designated by a letter of the alphabet. He explained that there are no even-numbered townhomes located on K Court,

and no odd-numbered townhomes located on J Court. The courts are located off of main drives known as "Harford Square Drive," and "Charleston Drive." At 9:55 p.m. on November 11, 1995, he received a call "to go to an address and check the rear of the residence for a female they believed was intoxicated, laying out in the weather...." The HCSO dispatcher told him to check "to the rear of 1436 Harford Square Drive.... It will be J—John—Court. Cross-street is Charlestown [sic]." There was no mention of woods in the dispatch.

When Thomas got to 1436 J Court, "it was raining pretty hard" and "[v]ery cold." Thomas "[w]alked to the rear of the residence," but "[s]aw nobody." He "[r]econtacted [the] dispatcher to ask if somebody could come point her out to [him] from the complainant." When the dispatcher replied that there was no reconnect information, Thomas "walked that whole line of houses on that side of the court and then back around to the front." Behind the J Court townhomes, there was a footpath and "a community of trees in between the back of J Court and the back of the other courts ... behind it, along [a] footpath." Thomas "[s]aw nobody," only "regular backyard kinds of stuff." At that point, he encountered a Maryland State trooper who had also responded to the call, but had searched behind J1 Court, another separate court next to J Court. Finding no one, Thomas radioed the dispatcher that the call was an "unfounded complaint."

In response to the motions to dismiss, appellant voluntarily dismissed Officer Thomas. On November 16, 1999, the court issued a memorandum opinion and order dismissing Archer, Terrell, the Doe defendants, and the State. The court concluded that Terrell had public official immunity from negligence claims, but that Archer did not. Nevertheless, the court held that neither Archer nor Terrell could have been negligent "because there was no existing duty [to] ... the victim," who "never knew of the conversation Ms. Archer had with the anonymous caller," and therefore, "could [not] have relied upon Ms. Archer's protection...."

Appellant filed this appeal, challenging only the dismissal of her claims against Archer and Terrell.

## DISCUSSION

This suit arising out of Tiffany Fouts' tragic death presents a question of first impression in Maryland. We must decide whether police dispatchers who receive a call for assistance are presumed, as a matter of law, to have a special duty to aid or rescue a crime victim from the peril in which her assailants placed her. In doing so, we consider standards governing the negligence liability of police dispatchers and other similarly situated emergency dispatchers.

Appellant challenges the trial court's conclusion that appellees cannot be held liable for negligence because they did not owe a private or "special" duty to Tiffany. Citing the unique nature of an emergency services dispatcher's job, appellant argues that "Archer and Terrell did owe a legal duty of care to [Tiffany] based on the fact that [Tiffany] was an individual and a member of the class of persons who are the subjects of 911 or emergency calls, . . . and injury to her from failing to give correct location information was readily foreseeable."

We do not agree that police dispatchers owe a private duty of care to all persons on whose behalf a request for assistance has been made. Instead, we conclude that the negligence liability of a police dispatcher must be decided on a case-by-case basis, using the "special duty rule" to determine whether the dispatcher had a "special relationship" with the victim that justifies the imposition of a private duty of care toward that victim. In this case, we conclude that the police dispatcher did not have a special duty to the crime victim on whose behalf a request for emergency services was made, because the victim did not detrimentally rely on the dispatcher's promise to send a police officer, and because, as a matter of law, any reliance on that promise by the potential rescuers who placed the call was not justified. We shall affirm the dismissal of appellant's claims against appellees. In light of

that holding, we will not review the trial court's holdings regarding appellees' immunity claims.[2]

## I.

### Special Duty To Rescue

The question of whether a tort duty is owed is a question of law for the court. *See Bobo v. State*, 346 Md. 706, 716, 697 A.2d 1371 (1997); *see also Mullin v. City of South Bend*, 639 N.E.2d 278, 283 (Ind.1994) (whether a police dispatcher has a special duty to a person in need of emergency services is a question of law for the court). "A tort duty is 'an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.' " *Eisel v. Bd. of Educ. of Montgomery County*, 324 Md. 376, 385–86, 597 A.2d 447 (1991) (citations omitted).

As a general rule, there is no affirmative legal duty to rescue someone in peril.[3] " 'The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him

---

2. Thus, we do not decide whether the trial court erred in holding that Archer, a civilian police communications officers serving as the HCSO dispatcher, was a "government employee" who did not have immunity from negligence claims under Md.Code (1974, 1998 Repl. Vol., 2000 Cum.Supp.), § 5–303 of the Courts and Judicial Proceedings Article ("CJ").

3. Although the "no duty to rescue" rule has been widely discussed and criticized from both a legal and moral perspective, few states have enacted "duty-to-aid" legislation. *See generally* L. Murphy, *Beneficence, Law, and Liberty: The Case of Required Rescue*, 89 Geo. L.J. 605, 611 n. 23 (2001) (summarizing state laws imposing a duty to aid crime victims or to report criminal activity). A duty to rescue "may be established in a number of ways: (1) by statute or rule, (2) by contractual or other private relationship, or (3) indirectly or impliedly by virtue of the relationship between the tortfeasor and a third party[.]" *Bobo v. State*, 346 Md. 706, 715, 697 A.2d 1371 (1997) (citations omitted). In this case, we are concerned only with the "private relationship" grounds for imposing a private duty of care. *Compare, e.g., Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 753 A.2d 41 (2000)(considering whether domestic violence protection statute imposed on police officer a special duty to protect domestic violence victims).

a duty to take such action.' " *Lamb v. Hopkins*, 303 Md. 236, 242, 492 A.2d 1297 (1985) (quoting *Restatement of Torts (Second)* § 314).

"The main rationale behind the no duty to rescue rule is that the defendant did not engage in any action that gave rise to the plaintiff's harm." J. Groninger, *No Duty to Rescue: Can Americans Really Leave a Victim Lying in the Street? What Is Left of the American Rule, and Will It Survive Unabated?*, 26 Pepp. L.Rev. 357, 358 (1999). Underlying the rule is a distinction between "harmful conduct" and "failure to confer a benefit." [4] *See generally* L. Murphy, *Beneficence, Law, and Liberty: The Case of Required Rescue*, 89 Geo. L.J. 605, 628 (2001). "*A* fails to benefit *B* when *A* could, but does not, perform an action that would make *B* better off. On this ordinary understanding, a failure to rescue is a failure to benefit.". *Id.*

In contrast, "when the defendant does bring about the cause or the event which is harming the plaintiff, the

---

4. The rule also embodies the common law distinction between action and inaction. *See, e.g., Restatement* § 314 cmt. c ("The origin of the rule lay in the early common law distinction between action and inaction, or 'misfeasance' and 'nonfeasance' "). We think this distinction has been persuasively criticized.

 Whatever practical difficulties a court may encounter in distinguishing nonfeasance from misfeasance, once made, the distinction is more than academic. If a court characterizes the defendant's behavior as nonfeasance, ... the defendant ordinarily will owe no duty to the plaintiff; the case may be dismissed. As a result, unreasonable behavior may be immune from liability as long as a defendant can successfully characterize it as nonfeasance.
 \* \* \*
 [T]he distinction between action and inaction is not necessarily the difference between causation and the lack of it.... Even if it were, ... the characterization of behavior as an act or a non-act is often susceptible to judicial manipulation.
 J. Adler, *Relying Upon the Reasonableness of Strangers: Some Observations About the Current State of Common Law Affirmative Duties to Aid or Protect Others*, 1991 Wis. L.Rev. 867, 872–73, 923–24 (1991). *See also Restatement* § 314 cmt. c (decisions based on the "nonfeasance" distinction "have been condemned by legal writers as revolting to any moral sense" and eventually may prompt "further inroads upon the older rule").

defendant does have a duty to rescue." *Groninger, supra,* 26 Pepp. L.Rev. at 374 n. 225. Moreover, even "[i]f there is no duty to come to the assistance of a person in difficulty or peril, ... there is at least a duty to avoid affirmative acts making his situation worse." *Furr v. Spring Grove State Hosp.,* 53 Md.App. 474, 487, 454 A.2d 414 (1983). Thus, defendants whose wrongful conduct either creates or increases the victim's peril do owe a private duty of care to their victim.

 Maryland, like most other jurisdictions, recognizes a common law exception to the "no duty to rescue" rule when there is a special relationship between the potential rescuer and the endangered person. *See Ashburn v. Anne Arundel County,* 306 Md. 617, 628, 510 A.2d 1078 (1986); *Restatement (Second) of Torts* § 314A ("*Restatement* "). The rationale for the exception is that special duties "arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule." *Restatement* § 314A cmt. b. It is the victim's justifiable reliance on an expectation of assistance that creates the "special relationship" between the victim and the defendant, and in turn, justifies the imposition of a special duty to aid, protect, or rescue that victim.

> Providing the essential causative link between the "special duty" assumed by the municipality and the alleged injury, the "justifiable reliance" requirement goes to the very heart of the special relationship exception, which is predicated in large measure on "the unfairness that the courts have perceived in precluding recovery when a [defendant's] voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced [her] either to relax [her] own vigilance or to forego other available avenues of protection."

*Grieshaber v. City of Albany,* 279 A.D.2d 232, 720 N.Y.S.2d 214, 217 (2001) (citations omitted); *see also Restatement* § 314A cmt. b ("The law appears ... to be working slowly toward a recognition of the duty to aid or protect in any relation of dependence or of mutual dependence").

■■ Examples of special relationships that, as a matter of law, create a special duty to aid, protect, or rescue include relationships between "carrier and passenger, innkeeper and guest, invitor and business visitor, school and pupil, employer and employee, [and] landlord and tenant...." *Valentine,* 353 Md. at 553, 727 A.2d 947 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 30, at 356 (5th ed.1984)). The imposition of such a "special duty *per se*" traditionally has been limited to these relationships, with the caveat that "there may ... be other relations which impose a similar duty." *Restatement* § 314A *caveat.*

■■ In most other cases, whether there is a special relationship creating a private duty in tort is determined on a case-by-case basis. *See id.* at cmt. b. The case-by-case approach permits tort recovery in meritorious cases while preserving the general rule that there is no duty to rescue. *See City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861, 863 (1993).

■■ In cases involving tort claims against public servants, there are additional considerations affecting our determination of whether, in addition to the public duty owed to the community at large, a public defendant also owes a private duty to an individual plaintiff. "[A]mong the variables to be considered in determining whether a [private] tort duty should be recognized are ... 'the policy of preventing future harm, [and] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach....' " *Village of Cross Keys, Inc. v. U.S. Gypsum Co.,* 315 Md. 741, 752, 556 A.2d 1126 (1989) (quoting *Tarasoff v. Regents of Univ. of Calif.,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976)). Courts have been reluctant to impose a special duty *per se* upon an entire class of public employees. In *Warren v. Dist. of Columbia,* 444 A.2d 1 (D.C.1981), the District of Columbia courts explained why imposing a special duty *per se* is not always necessary to ensure that the employee is held "accountable" for mistakes.

A duty owed to the public ... is no less enforceable because it is owed to "everybody." Public officials at all levels remain accountable to the public and the public maintains elaborate mechanisms to enforce its rights—both formally in the courts and less formally through internal disciplinary proceedings. . . .

The absence of a duty specifically enforceable by individual members of the community is not peculiar to public police services. Our representative form of government is replete with duties owed to everyone in their capacity as citizens but not enforceable by anyone in his capacity as an individual. Through its representatives, the public creates community service; through its representatives, the public establishes the standards which it demands of its employees in carrying out those services and through its representatives, the public can most effectively enforce adherence to those standards of competence. As members of the general public, individuals forego any direct control over the conduct of public employees in the same manner that such individuals avoid any direct responsibility for compensating public employees.

*Id.* at 8 (adopting Superior Court's opinion).

In addition, the Court in *Warren* contrasted the modest benefits likely to result from imposing a private tort law duty on public servants with the potentially enormous public costs of doing so.

Plaintiffs in this action would have the Court and a jury of twelve ... judg[e] the adequacy of a public employee's performance in office. Plaintiff's proposition would lead to results ... aptly described as "staggering." ... [S]hould a Court and jury ... sift through clues known to the police in order to determine whether a criminal could reasonably have been apprehended before committing a second crime? Should a Court also be empowered to evaluate, in the context of a tort action, the handling of a major fire and determine whether the hoses were properly placed and the firemen correctly allocated? Might a Court also properly

entertain a tort claim ... over a postman's failure to deliver promptly an important piece of mail?

Establishment by the Court of a new, privately enforceable duty to use reasonable diligence in the performance of public functions would not likely improve services rendered to the public. The creation of direct, personal accountability between each government employee and every member of the community would effectively bring the business of government to a speedy halt, "would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and dispatch a new generation of litigants to the courthouse over grievances real and imagined. An enormous amount of public time and money would be consumed in litigation of private claims rather than in bettering the inadequate service which draws the complaints. Unable to pass the risk of litigation cost on to their "clients," prudent public employees would choose to leave public service.

*Id.* at 8–9. *See also White v. Beasley,* 453 Mich. 308, 552 N.W.2d 1, 11 (1996) (public duty doctrine serves useful purpose of protecting government from "unreasonable interference with policy decisions").

 In Maryland, we use the case-by-case approach to determine whether a police officer had a special duty to protect, aid, or rescue an individual plaintiff. In *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), the Court of Appeals considered the tort duty of police officers called upon to protect citizens endangered by the criminal conduct of a third party. In that case, a police officer found a drunk man sitting in a truck in a parking lot, and told him not to drive; he did not conduct a field sobriety test or arrest him. As soon as the officer left, the man drove away. Within a short distance, he hit Ashburn, a pedestrian, resulting in the loss of Ashburn's leg. *See id.* at 620, 510 A.2d 1078. The trial court dismissed Ashburn's negligence complaint, on the grounds that (1) the officer had public official immunity from negligence liability, and (2) alternatively, the officer had no special

duty to protect Ashburn from the consequences of the driver's criminal conduct. *See id.*

After concluding that the officer had qualified public official immunity from liability for non-malicious acts, the Court held that dismissal of the negligence claim against the officer also was appropriate because the officer had no tort duty to Ashburn.

> Even if we were to assume that [the officer was statutorily required to stop or detain the driver], *i.e.,* that the statute made [the officer's] actions ministerial, and thus nondiscretionary, appellant's cause would still fail because he did not establish that [the officer] owed him a duty in tort.

*Id.* at 626, 510 A.2d 1078.

The *Ashburn* Court concluded that the duty usually owed by a police officer is a duty to the public at large, rather than a private duty to a single individual.

> [W]e recognize the general rule, as do most courts, that absent a "special relationship" between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers. Rather, the "duty" owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition.

*Id.* at 628, 510 A.2d 1078 (citations omitted). It adopted the "special duty rule" to define when a particular officer owes a private duty of care to an imperiled person.

> *If [a plaintiff] alleges sufficient facts to show that the defendant policeman created a "special relationship" with him upon which he relied, he may maintain his action in negligence.* This "special duty rule," as it has been termed by the courts, is nothing more than a modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner. *In order*

*for a special relationship between police officer and victim to be found, it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection.*

*Id.* at 630–31, 510 A.2d 1078 (emphasis added) (citations omitted). Applying this "affirmative act plus specific reliance" test, the Court concluded that Ashburn failed to establish a special relationship, because he "alleged no facts which show that [the officer] affirmatively acted specifically for appellant's benefit or that [the officer's] actions induced appellant's reliance upon him." *Id.* at 631–32, 510 A.2d 1078.

In *Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 753 A.2d 41 (2000), the Court of Appeals recently reviewed a variety of different "special duty tests" used in other jurisdictions. *See id.* at 146–50, 753 A.2d 41. It explicitly declined to modify the *Ashburn* test by using the more detailed, multi-part tests adopted in other jurisdictions, holding that "the intent of the 'special relationship' doctrine is better addressed by our general standard outlined in *Ashburn.*" *Id.* at 150, 753 A.2d 41.[5]

## II.

### Application Of The Special Duty Rule To Police Dispatchers

Appellant first argues that the trial court erred by applying "no duty to rescue" and "special duty" rules to appellees. She contends that the nature of the relationship between a police dispatcher and a person on whose behalf a call for assistance

---

5. In *Williams,* a case involving whether a police officer negligently failed to protect members of a family who were killed and paralyzed by an estranged boyfriend, the Court held that disputes regarding facts material to whether the police officer had promised protection precluded summary judgment on the basis of the special duty rule. *See Williams v. Mayor & City Council of Baltimore,* 359 Md. 101, 150, 753 A.2d 41 (2000).

has been made is one of those "special relationships" that create, as a matter of law, a special duty to rescue. Her theory is that, by providing police dispatchers such as Archer to answer and relay calls for assistance, the HCSO "assumed" a special duty to aid and rescue Tiffany and all other persons on whose behalf a call for police assistance is made. She asserts that, as a matter of law, Archer had a special relationship with Tiffany, and therefore had a special duty to rescue Tiffany, regardless of whether anyone "specifically relied" on Archer's promise to "send someone out."

In support of her effort to impose a special duty *"per se"* on police and other emergency dispatchers, she offers two policy rationales and two legal arguments. We do not find any of these persuasive. Instead, we conclude that the special duty rule should be applied on a case-by-case basis to determine the negligence liability of a police dispatcher.

■ Before addressing appellant's arguments, however, we think it is helpful to clarify our focus in cases involving a civil duty to rescue. The initial focus in such cases must be on whether the defendant's conduct warrants the imposition of a private tort duty, rather than on whether the plaintiff's injuries should be compensable.

Tort liability should not be imposed unless that imposition can be justified on tort criteria. ***Even when a defendant's undoubtedly careless conduct has harmed another, tort law asks whether the defendant owed the plaintiff any duty not to act in that manner.*** Courts face concerns that included unbounded and disproportionate liability, the impact of judgments on defendants and society, the need to deter dangerous conduct, the administrability of new claims in terms of numbers of suits and the nature of proof, and whether a new damage claim can be effectively controlled.... ***As tort law currently operates, courts must initially focus on whether the defendant's conduct warrants the imposition of liability. Compensation, which focuses on the plaintiff, comes into play only after a court***

*concludes the defendant's conduct warrants the imposition of a duty.*

M. Franklin & M. Ploeger, *Symposium: Of Rescue and Report: Should Tort Law Impose A Duty To Help Endangered Persons or Abused Children?*, 40 Santa Clara L.Rev. 991, 1000 (2000) (emphasis added). Keeping in mind that the threshold question is whether the conduct of police dispatchers warrants imposing a special duty on them as a matter of law, we turn to the important questions raised by this appeal.

### A.

### Policy Reasons For And Against Imposing A Special Duty On Dispatchers

Appellant's first policy argument in favor of the blanket imposition of a special duty on dispatchers is that

the legal duty owed by [Archer] to Tiffany .... [was] no different than if a county vehicle operated by an ordinary government employee negligently failed to stop at a traffic signal causing death or injury to another, for which recovery is available.

This "apples-to-oranges" analogy is inapposite. Negligent police dispatchers are not "just like" negligent government drivers, because such dispatchers do not create the plaintiff's peril. The government driver who injures a plaintiff through his negligence is liable because he created the peril, not because he failed to rescue the plaintiff from it. We see no relevant similarity between the negligent dispatcher and the negligent driver.

Appellant's second reason for imposing a special duty *per se* on police dispatchers has a broader, and more facially appealing, policy predicate. She argues that

[e]mergency calls for help, either through a 911 system or secondary civilian dispatch operator, have become an integral part of our daily life and society. The State and local governments have assumed the burden and duty to provide aid (emergency and otherwise) to its citizens.... Citizens ... are routinely encouraged to rely upon [this system] and

use it regularly for their own safety and for the safety of others who are ... unable to make direct contact.... To suggest that it is acceptable for a dispatch operator to inaccurately convey critical information to responding emergency personnel would severely undermine the public's confidence in the system and in the system's ultimate ability to ultimately succeed.... Moreover, allowing such mistakes to continue with the inevitable and foreseeable resultant harm without accountability is not an acceptable societal standard.

We are not persuaded, however, that appellant's legitimate concerns regarding dispatcher standards, accountability, and public reliance justify imposing a private duty of care for each and every call for emergency assistance. We conclude that the presence of a special relationship between a dispatcher and a victim should not be presumed solely on the basis of either a call for assistance or the dispatch of such assistance. We explain, first addressing appellant's policy concerns, and then our countervailing concerns.

First, we disagree with appellant's contention that a special duty should be presumed because harm from a dispatcher's negligence is highly foreseeable. The *Ashburn* Court made it clear that foreseeability alone cannot establish a special duty in tort. The Court explicitly rejected the use of a strict "forseeability" test as the touchstone for determining whether a police officer has a duty to aid a crime victim. *See Ashburn,* 306 Md. at 628, 510 A.2d 1078. Acknowledging that the "foreseeability factor" is of critical importance in determining whether there is a legal duty, the Court cautioned that

"foreseeability" must not be confused with "duty." ***The fact that a result may be foreseeable does not itself impose a duty in negligence terms.*** This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a "special relationship" exists either between the actor and the third person or between the actor and the person injured.

*Id.* (emphasis added) (citations omitted). *See also Valentine,* 353 Md. at 551, 727 A.2d 947 ("not all foreseeable harm gives rise to a duty; there are other factors to consider such as intervening circumstances or parties").

Similarly, we do not agree that the inherently "high risk" nature of a dispatcher's interaction with the public is sufficient reason for imposing a special duty *per se.* In *Valentine,* the Court of Appeals rejected an analogous argument in the context of a private defendant. The Court declined to use the special duty rule to expand the tort liability of gun store owners. In doing so, the Court reasoned that a private defendant does not have a private duty of care solely because he is engaged in activity that presents a substantial, but generalized risk of harm. *See id.* at 551–53, 727 A.2d 947.

We have followed a similar rationale in limiting the tort liability arising from a government's provision of public safety services. In *Willow Tree Learning Center, Inc. v. Prince George's County,* 85 Md.App. 508, 584 A.2d 157 (1991), we held that a child fatally injured on his day care center's playground equipment did not have a claim against municipal defendants who were responsible for regulating and inspecting that equipment. We explained that a government's offer of safety-related services does not, in itself, create a special duty of care. "We do not believe that a special relationship, creating a tortious duty, is created by a governmental decision to legislate safety programs in a particular industry, unless that duty is expressly created by the statute." *Id.* at 519, 584 A.2d 157.

Nor are we persuaded that appellant's "reliance of the public" rationale merits imposing on dispatchers a special duty as a matter of law. The dispositive answer to this argument is that case-by-case determinations of whether a particular dispatcher owed a special duty to a particular plaintiff fully address any "reliance" concerns. Using the *Ashburn* test, if the plaintiff specifically relied on a dispatcher's affirmative promise to send assistance, then the dispatcher had a special duty to that plaintiff. Plaintiffs who can show such reliance

simply do not need the automatic presumption of special duty that appellant advocates. A case-by-case application of the special duty rule adequately ensures responsibility, by holding negligent dispatchers accountable. *See City of Rome v. Jordan*, 263 Ga. 26, 426 S.E.2d 861, 863 (1993).

Most importantly, we also reject the corollary to appellant's reliance argument—that the nature of the relationship between a dispatcher and a crime victim is sufficiently special to justify imposing a special duty *per se.* Reliance is critical to establishing a special duty. We recognize that in certain relationships (*i.e.*, common carrier-passenger, innkeeper-guest, landowner-business invitee, school-pupil, employer-employee, and landlord-tenant), detrimental and reasonable reliance is presumed as a matter of law. That presumption, in turn, justifies imposing a special duty without inquiring into the specific contact between the plaintiff and defendant. But we do not view the dispatcher-victim relationship as sufficiently similar to warrant an analogous presumption.

Persons in need of emergency assistance do not have an inherently "dependent" relationship with a dispatcher *before* they become imperiled. Unlike the common carrier, landlord, innkeeper, employer, and school, the dispatcher has no control over either the victim or the environment in which the victim encounters her peril. Unlike the passenger, tenant, guest, employee, and pupil, the victim cannot reasonably expect an emergency services dispatcher to take steps to protect her from such peril, either by preventing it in the first place or by being in the vicinity to offer aid in the event that she encounters it. Only persons on whom the victim is presumed to rely are charged with a legal duty to either prevent the peril, or to provide a means of escaping it. Indeed, this may reflect that, through their opportunity to exercise control over the victim and her environment, such persons might be said to "create" or "increase" the victim's peril.

There is no analogous opportunity for the dispatcher to prevent or avoid the vast universe of perils facing the public. Therefore, there is no reason to presume as a matter of law

that a particular victim has relied on her to do so. Rather, it is only as the result of the specific contact between a particular dispatcher and a particular plaintiff, after the plaintiff has already been placed in peril, that the victim might depend, or "justifiably rely," on the dispatcher to aid or rescue her. The special duty test examines whether such reliance occurred.

■ It appears that appellant has focused exclusively on the victim's perspective rather than the dispatcher's perspective. In doing so, she has brushed aside the dispositive question: whether the conduct of emergency dispatchers warrants the imposition of a special duty as a matter of law. Rephrased in terms of the dispatcher's conduct, appellant's argument is that making a dispatcher available to receive requests for assistance warrants the imposition of a private tort duty as a matter of law. We disagree, because making a dispatcher available to receive requests for assistance does not create or increase a victim's peril, nor does it invariably induce victims or potential rescuers to rely on the dispatcher by foregoing opportunities for aid or rescue. Simply put, the mere receipt of a request for assistance does not cause or contribute to any injury.

■ We conclude, therefore, that the legal duty owed by police dispatchers to the class of persons who are the subject of 911 or emergency calls, by virtue of their position, is a *public* duty to aid. A police dispatcher's work is necessarily an integral link in the chain of emergency services ultimately delivered by the responding police officers. Thus, it is appropriate to measure the negligence liability of police dispatchers by the same standard applied to the police officers who respond to their dispatches. Accordingly, we find the *Ashburn* Court's distinction between police officers' public duties and their private tort duties equally appropriate and applicable to dispatchers.

> [T]he "duty" owed by the police by virtue of their positions as officers is only a duty to protect the public, and the breach of that duty is most properly actionable by the public

in the form of criminal prosecution or administrative disposition.

*Ashburn,* 306 Md. at 628, 510 A.2d 1078.

Our holding takes into account the public policy concerns regarding a public entity's tort liability. Imposing a special duty *per se* on police dispatchers toward every person on whose behalf a call for assistance is made would have serious consequences. "For the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits." *Riss v. City of New York,* 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 861 (1968). Ultimately, it may even result in the reduction of public safety services, including emergency response programs and personnel, to the community.

The weight of authority outside this State supports our holding. Our review of cases involving police, "911," and other emergency services dispatchers indicates that other courts usually treat emergency services dispatchers and responding emergency services personnel alike, and apply the special duty rule to both on a case-by-case basis. *See, e.g., Sullivan v. City of Sacramento,* 190 Cal.App.3d 1070, 235 Cal.Rptr. 844 (1987) (liability of police operator determined under same special duty rule applied to responding police officer); *Noakes v. City of Seattle,* 77 Wash.App. 694, 895 P.2d 842, *rev. denied,* 127 Wash.2d 1021, 904 P.2d 299 (1995) (same, 911 dispatcher); *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861 (1993) (same, police dispatcher); *Koher v. Dial,* 653 N.E.2d 524 (Ind.App.1995) (same, police radio dispatcher); *De Long v. County of Erie,* 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983) (same, 911 "complaint writer" and police dispatcher).

Moreover, courts that have declined to impose a special duty *per se* on dispatchers have emphasized that neither the availability of an emergency services dispatcher nor the occurrence

of dispatcher error necessarily warrants imposing a special duty as a matter of law. In a noted negligent dispatch case, the New York Court of Appeals declined to adopt the broad rule that appellant now advocates.[6] It held that although the public is encouraged to call the police for assistance, and even though that fact may be considered in determining whether a particular dispatcher had a special duty to a particular crime victim, neither the availability of an emergency dispatch system nor the occurrence of dispatcher error justifies the imposition of a special duty for each and every call.

> When an emergency service is involved it must be recognized that the circumstances are often quite demanding and that some mistakes will occur, even when the service is well organized and conscientiously administered. Allowance must be made for this and although any error, however slight, may have dire consequences, it will not always justify an award for damages.

*De Long,* 469 N.Y.S.2d 611, 457 N.E.2d at 722.

We conclude that a case-by-case application of the special duty rule is a more appropriate means of deciding whether a dispatcher's negligence justifies civil damages. We agree with those courts that have declined to impose a special

---

**6.** In that case, decided before New York adopted its widely followed special duty test, the court considered a judgment in favor of the estate of a murder victim. *See De Long v. County of Erie,* 60 N.Y.S.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983). The victim, who lived a block and a half from a police station, called 911, asking for the police to "come right away" to "319 Victoria" because a man was trying to break into her house. A complaint writer for Erie County responded, "Okay, right away." Unfortunately, he recorded "219 Victoria," then assumed that the call originated from Victoria Avenue in Buffalo rather than 319 Victoria Boulevard in Kenmore, a small village adjacent to Buffalo. He relayed the incorrect street address to a police dispatcher, who reported a burglary in progress at the city address. Three minutes later, responding officers reported that there was no such address. Five minutes after the call came in, the police dispatcher "cleared the call," effectively telling officers to disregard it. Thirteen minutes after she called 911, Mrs. De Long was seen running from her house, naked and bleeding. A neighbor called the local police, who arrived in a minute. Mrs. De Long bled to death from multiple stab wounds. *See id.* 469 N.Y.S.2d 611, 457 N.E.2d at 719.

duty *per se* on police and emergency dispatchers. "Rather than making sweeping conclusions regarding tort liability based upon the utilization of '911' or similar emergency call systems, this Court believes that it is preferable to analyze a claim of a special duty by applying the ... [special duty] test...." *Wolfe v. City of Wheeling,* 182 W.Va. 253, 387 S.E.2d 307, 312 (1989). Thus, "a special relationship does not come into being simply because an individual requests assistance from the police." *Morgan v. Dist. of Columbia,* 468 A.2d 1306, 1313 (D.C.1983) (*en banc*) (citations omitted). Nor does a dispatcher's decision to dispatch an officer justify the imposition of a private duty; "[s]tanding alone, a governmental entity's dispatch of emergency services does not create a private duty." *Koher v. Dial,* 653 N.E.2d 524, 526 (Ind.App. 1995); *Morgan,* 468 A.2d at 1315 ("A special relationship ... does not exist merely because an individual requests, or a police officer promises to provide protection").[7] For all of these reasons, we hold that neither a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to the person in need of such assistance.

### B.

### The "No Special Duty" Defense Is Available To Persons Who Are "Government Employees" Without Public Official Immunity

Appellant offers two alternative legal arguments challenging the trial court's application of the special duty rule to her claims. She argues that the trial court erred in permitting

---

7. The Arizona cases cited by appellant for the proposition that "[s]ome courts have reasonably found that, by providing a 911 service, a municipality assumes a duty of care to those it serves," are not persuasive because in both, liability was premised on a specific contact between the specific dispatcher and the specific victim. *See, e.g., Austin v. City of Scottsdale,* 140 Ariz. 579, 684 P.2d 151 (1984) (dispatcher owed duty based on anonymous call regarding death threat against specific person at specific address); *Hutcherson v. City of Phoenix,* 188 Ariz. 183, 933 P.2d 1251, 1256–57 (App.1996), *rev'd in part on other grounds,* 192 Ariz. 51, 961 P.2d 449 (1998) (dispatcher owed duty to identified 911 caller asking for protection at specific address).

appellees to assert a "no special duty" defense, because (1) the "no duty to rescue" rule and the special duty rule were abrogated by the Local Government Tort Claims Act ("LGTCA"), *codified at* Md.Code (1974, 1998 Repl.Vol.), § 5–303 of the Courts and Judicial Proceedings Article ("CJ"), by "waiving immunity for government employees ... whose tortious conduct has caused injury"; and (2) the "no special duty defense" is available only to "public officials," and not to "mere government employees," such as Archer and Terrell. We disagree with both contentions.[8]

Before discussing appellant's contentions, we wish to address preliminarily a fundamental error underlying appellant's arguments. Appellant has confused the special duty rule with concepts of public official immunity. The "no duty to rescue" and "special duty" rules are basic tort law doctrines tied to the first element of negligence—duty. *See Ashburn,* 306 Md. at 627, 510 A.2d 1078 ("negligence is a breach of a duty owed to one, and absent that duty, there can be no negligence"). The *Ashburn* test is the method for determining whether a special duty exists in the particular circumstances of a case involving an alleged failure to protect, aid, or rescue. Thus, the special duty rule is viable regardless of whether the defendant in question is a public official, government employee, or private actor, and regardless of whether

---

**8.** Although we need not decide whether, as a matter of law, Archer was a government employee, we do note that the record before us does not reveal facts that may be relevant to that decision, including what Archer's specific duties were, what discretion she had in interpreting information provided by a caller, whether Archer was the dispatcher who spoke with officer Thomas, whether Archer relayed to another dispatcher the correct "K Court" location "in the woods," whether Archer or another dispatcher recognized that the street address provided by the caller did not exist, and whether the dispatch to J Court was a deliberate change in the address provided by the caller.

Moreover, even if we accepted the highly questionable proposition that police dispatchers such as Archer are, as a matter of law, "mere receptionists" who perform only nondiscretionary acts, we would still apply the special duty rule. For the reasons discussed *infra,* the *Ashburn* test applies to police dispatchers regardless of whether they act as "mere receptionists."

the defendant in question may have statutory or common law immunity. *See, e.g., Ashburn,* 306 Md. at 626, 510 A.2d 1078 (special duty rule provided alternative to public official immunity as grounds for dismissal); *Lauer v. City of New York,* 95 N.Y.2d 95, 711 N.Y.S.2d 112, 733 N.E.2d 184, 187 (2000) (fact that governmental act complained of was ministerial " 'merely removes the issue of governmental immunity from a given case,' " but does not necessarily make the act tortious) (citations omitted).

▬ We recognize that negligence cases involving government defendants often involve both "special duty rule" and immunity issues. But these two concepts have different origins and require separate analysis. Immunity is premised on the notion that, for policy reasons, certain defendants should be relieved of liability for their negligent acts. In contrast, the special duty rule is premised on the fundamental tort law notion that a defendant cannot be held negligent if she did not have a duty to the plaintiff. The difference between immunity and the special duty rule is that immunity "releases" certain persons from liability for their negligence, while the special duty rule "rules out" a finding of negligence altogether.

▬ Thus, "[t]he initial question of duty precedes any discussion of sovereign immunity, which 'is a defense rather than an inroad on one of the elements of a tort.' " *City of Rome,* 426 S.E.2d at 862 n. 1 (citations omitted). If the government defendant did not have a duty to the plaintiff, and thus was not negligent, it is unnecessary to decide whether that defendant also had immunity from negligence. With these theoretical and procedural distinctions in mind, we now turn to appellant's legal arguments.

### 1.

### The LGTCA Did Not Abrogate The "No Special Duty" Defense

▬ Appellant contends that the LGTCA abrogated the special duty rule, and therefore precluded appellees from

using a "no special duty" defense. We disagree. Nothing in the LGTCA purports to eliminate a common law defense such as the "no special duty" defense. Rather, the LGTCA merely holds certain local *governments* financially responsible for negligent acts of their *employees*. *See Ashton v. Brown*, 339 Md. 70, 104, 660 A.2d 447 (1995). It, therefore, does not alter the tort law duties of the individual municipal employees, either by imposing additional legal duties or by "waiving" common law defenses that the individual employee might have. To the contrary, by providing that the local government "does not waive any common law ... defense ... possessed by an employee of a local government," the Act implicitly confirms that it does not constitute a waiver of an individual employee's common law defenses. *See* CJ § 5–303(d).

*Ashburn* illustrates that a government defendant has a "no special duty" defense even if that defendant does not have immunity under the LGTCA. The *Ashburn* Court addressed, separate and apart from the officer's claim of immunity, the different question raised by the "special duty" rule—whether the defendant owed the plaintiffs "a duty in tort." *Ashburn*, 306 Md. at 626, 510 A.2d 1078. It held that even if the officer did not have public official immunity for his allegedly negligent acts, the special duty rule provided an independent and alternative basis for dismissing the plaintiffs' negligence claims against him. *See id.* at 626, 510 A.2d 1078.

### 2.

### The "No Special Duty" Defense Is Available To Government Employees

Citing *Ashburn*, appellant argues that "[t]he special relationship doctrine is misapplied to an ordinary government employee," such that the "no special duty" defense is available "only in the context of a public official, specifically to police officers performing their duty." Appellant's reliance on *Ashburn* for the proposition that government employees may not assert a "no special duty" defense is misplaced. Although *Ashburn* involved the alleged negligence of a police officer

who was a "public official," there is no language in that opinion indicating that the "no special duty" defense is available *only* to public officials. *Ashburn* did not consider this question because the case involved a police officer who was a public official, rather than a "mere" government employee. *See Ashburn,* 306 Md. at 626, 510 A.2d 1078.

It is clear that the special duty rule applies outside of the public official and police officer context. Maryland courts have applied the special duty rule in diverse factual settings involving both private and government defendants. *See, e.g., Scott v. Watson,* 278 Md. 160, 166, 359 A.2d 548 (1976) (landlord did not have special duty to protect tenants from criminal acts of third parties); *Lamb v. Hopkins,* 303 Md. at 249–50, 492 A.2d 1297 (probation officer did not have special duty to control conduct of parolee whose drunken driving caused child's severe injuries); *Southland Corp. v. Griffith,* 332 Md. 704, 719, 633 A.2d 84 (1993) (shopkeeper has "no special duty" defense against claim of business invitee in certain circumstances); *Valentine,* 353 Md. at 553, 727 A.2d 947 (gun store owner has no special duty to persons shot by gun stolen from his store); *Holson v. State,* 99 Md.App. 411, 414, 637 A.2d 871 (1994) (police officers do not have special duty to transport intoxicated passengers of arrested drivers to their destination); *Willow Tree Learning Center,* 85 Md.App. at 519–20, 584 A.2d 157 (county day care inspector did not have special duty to child fatally injured on day care center's playground equipment); *Furr,* 53 Md.App. at 488–89, 454 A.2d 414 (state mental hospital and its employees did not have special duty to child murdered by released patient).

In doing so, we have never specifically held that government employees are entitled to assert a "no special duty" defense. We have no trouble, however, concluding that the "no special duty" defense is just as available to government employees as it is to public officials, police officers, and private persons. Appellant offers no policy reason for imposing on an entire class of government employees a tort law duty that is greater than the duty of public officials and

private persons. We find none. Accordingly, we hold that, regardless of whether appellees were "government employees" or "public officials," the "no special duty" defense was available to both.

## III.

### Appellant Failed To Allege The Detrimental And Justifiable Reliance Necessary To Establish A Special Duty

As alternative grounds for reversal, appellant argues that even if appellees did not have a special duty as a matter of law, the trial court erred in holding that the complaint failed to allege the "specific reliance" necessary to establish that appellees had a special duty to Tiffany. In doing so, appellant raises another question of first impression in Maryland: whether a potential rescuer's reliance on the affirmative acts of a police dispatcher can satisfy the "specific reliance" requirement of the special duty test. We will not decide whether a third party's reliance on a police dispatcher's promise to send assistance is sufficient to impose a special duty to rescue on the dispatcher, because we conclude that even if such third party reliance could meet the test, in this case any detrimental reliance by the callers on Archer's promise to send someone out was not justifiable.

### A.

### Special Reliance Means Detrimental And Justifiable Reliance

The special duty test articulated by the *Ashburn* Court requires a showing that the affirmative act of the defendant "induc[ed] *the victim's specific reliance* upon the [defendant's] protection." *Ashburn*, 306 Md. at 631, 510 A.2d 1078 (emphasis added). As we explained above, the purpose of this "specific reliance" requirement is to establish the essential causative link between the defendant's actions and the plaintiff's injury. In *Cuffy v. City of New York*, 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937 (1987), the New York

Court of Appeals explained why detrimental and justifiable reliance is essential to establishing a special duty to aid or rescue.

[T]he injured party's reliance is as critical in establishing the existence of a "special relationship" as is the municipality's voluntary affirmative undertaking of a duty to act. That element provides the essential causative link between the "special duty" assumed by the municipality and the alleged injury. Indeed, at the heart of most of these "special duty" cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other available avenues of protection.... [W]hen the reliance element is either not present at all, or if, present, is not causally related to the ultimate harm, this underlying concern is inapplicable, and the invocation of the "special duty" exception is then no longer justified.

*Id.* 513 N.Y.S.2d 372, 505 N.E.2d at 940. *See also Noakes,* 895 P.2d at 844 (reliance must have been detrimental and justifiable); *City of Rome,* 426 S.E.2d at 863 (requiring "justifiable and detrimental reliance by the injured party on the municipality's affirmative undertaking"); *White,* 552 N.W.2d at 5 (requiring detrimental and justifiable reliance). We agree that proof of such reliance is critical to creating a private tort duty, because detrimental and reasonable reliance on the promise of emergency assistance connects the defendant's conduct to the plaintiff's injury. *See Eisel,* 324 Md. at 386, 597 A.2d 447. We, therefore, construe the "specific reliance" requirement under Ashburn's special duty test to mean reliance that is both detrimental and justifiable.

### B.

### Tiffany Did Not Detrimentally Rely On The Dispatcher's Promise To Send An Officer

It is undisputed that Tiffany did not detrimentally rely on Archer's promise to "send someone out." Lying

semiconscious or unconscious outside the residence, Tiffany was not aware that her assailants called the HCSO, much less that Archer promised to send an officer. "[I]t is impossible for a person who has been deprived of any realistic opportunity to choose between alternative 'avenues of protection' to detrimentally rely upon a municipality's promise of assistance." *Grieshaber v. City of Albany*, 279 A.D.2d 232, 720 N.Y.S.2d 214, 216 (N.Y.App.Div.2001). Tiffany did not stay outside because she was expecting a police rescue. *Compare Noakes v. City of Seattle*, 77 Wash.App. 694, 895 P.2d 842, 845 (1995) (question of fact presented by evidence that victims may have relied on 911 dispatcher's promise to send police in deciding to stay inside house as intruder was breaking in); *De Long v. County of Erie*, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717, 721 (1983) (same) *with Grieshaber*, 720 N.Y.S.2d at 216 (evidence that victim was already under attack when she reached 911 dispatcher prevented showing of detrimental reliance); *White v. Beasley*, 453 Mich. 308, 552 N.W.2d 1, 20 (1996) (victim who contacted neighbors, but was unaware neighbors then called 911 on her behalf did not detrimentally rely on promise of police protection); *R.C. v. Southwestern Bell Tel. Co.*, 759 S.W.2d 617, 621 (Mo.App.1988) (no detrimental reliance by victim who was already under attack when her roommate called for help). Because Tiffany did not call for help, did not know that the callers had done so, did not know that Archer promised to send someone out, and did not "choose" to stay outside in reliance on that promise, she did not detrimentally rely on a promise of police assistance.

Acknowledging that she cannot establish detrimental reliance by the victim, appellant argues instead that the detrimental reliance of Tiffany's assailants and would-be rescuers was sufficient to establish a special duty. Appellant asserts that Archer's promise to the boys who called on Tiffany's behalf increased Tiffany's peril because the callers detrimentally relied on it by foregoing opportunities to make an easy rescue. In effect, she seeks to "transfer" the potential rescuers' detrimental reliance to the victim.

Neither the Court of Appeals nor this Court has been called upon to apply the "specific reliance" requirement in a case where the call for emergency assistance was made by someone other than the person in need of that assistance. Thus, we found no Maryland precedent on this "transfer of reliance" question. Although the language in the *Ashburn* test speaks in terms of detrimental reliance by the victim, we do not read *Ashburn* as providing a definitive answer to this question. That language may reflect only that *Ashburn* did not involve a third party request for assistance.

Several other courts, however, have addressed "third party caller" cases. Many have held that emergency calls by third parties do not satisfy their state's special duty test, because the victim must have been aware of the promise to send assistance. *See, e.g., Cuffy v., City of New York,* 69 N.Y.2d 255, 513 N.Y.S.2d 372, 505 N.E.2d 937, 941 (1987) (no special duty owed when plaintiff did not know about promise of police protection); *Mullin v. City of South Bend,* 639 N.E.2d 278, 285 (Ind.1994) (no special duty when plaintiff was not aware of municipal policy governing dispatch of ambulances); *City of Rome v. Jordan,* 263 Ga. 26, 426 S.E.2d 861, 864 (1993) (no special duty when plaintiff was aware only that police had been called); *White v. Beasley,* 453 Mich. 308, 552 N.W.2d 1, 7 (1996) (no special duty when plaintiff was not aware that neighbors called to report assault).

In *Kircher v. City of Jamestown,* 74 N.Y.2d 251, 544 N.Y.S.2d 995, 543 N.E.2d 443 (1989), the New York Court of Appeals explicitly rejected a "transferred reliance" argument based on the reliance of third parties on a police promise of assistance in discontinuing rescue efforts. Two "good samaritan" bystanders witnessed a midday kidnapping and assault in a parking lot. They pursued the abductor. When they encountered a police officer, they reported the abduction, gave a description of the assailant and victim, and provided the make and license number of the car. The officer told them he would "call it in." "Believing that [their] report ... would suffice," the would-be rescuers abandoned their pursuit, and made no further effort to summon police. *Id.* 544 N.Y.S.2d 995, 543

N.E.2d at 444. The officer never reported the abduction. Traveling major highways in the same car, the abductor beat and raped the plaintiff, then left her for dead in the trunk. Twelve hours later a passerby who heard her pleas for help rescued her.

Citing policy reasons, the New York Court of Appeals held that no special duty was owed to the victim-plaintiff because the would-be rescuers' detrimental reliance on the police officer's promise

> cannot "be transferred to the plaintiff's benefit" [because] ... proof of their reliance does not satisfy the policy concern underlying the reliance requirement—providing the "essential causative link" between the municipality and the alleged injury.... Requiring that there be such reliance is consistent with the purpose of the special duty rule to place controllable limits on the scope of the municipality's duty of protection and to prevent the exception from swallowing the general rule.... Absent this requirement, a municipality would be exposed to liability every time one of its citizens was victimized by a crime and the municipality failed to take appropriate action although notified of the incident—so vast an expansion of the duty of protection should not emanate from the judicial branch.

*Id.* 544 N.Y.S.2d 995, 543 N.E.2d at 447–48.

The "victim reliance" requirement has been criticized as unjustifiably harsh when it precludes recovery on behalf of incapacitated victims, but this criticism generally has not resulted in a significant relaxation of that requirement. For example, in *Merced v. City of New York*, 142 Misc.2d 442, 534 N.Y.S.2d 60, 62 (N.Y.Sup.Ct.1987), *rev'd*, 75 N.Y.2d 798, 552 N.Y.S.2d 96, 551 N.E.2d 589 (1990), a New York trial court held that the reliance requirement of New York's special duty test must be broadened to include callers or complainants who relied on the police officers for assistance .... [because] 'but for' this reliance upon the officers the callers ... may have

affirmatively given aid to the decedent." [9] On appeal, however, the Court of Appeals reversed, holding that "the involvement of third parties did not satisfy the[ ] requirements" of direct contact and detrimental reliance by the victim, because "the municipality's conduct [did not] deprive[ ] decedent of assistance that reasonably could have been expected from another source." *Merced v. City of New York*, 75 N.Y.2d 798, 552 N.Y.S.2d 96, 551 N.E.2d 589, 589–90 (N.Y.1990).

We also find an instructive debate on this question in *White v. Beasley*, 453 Mich. 308, 552 N.W.2d 1 (1996), in which neighbors who heard the decedent being attacked called 911 on her behalf.[10] The majority held that the decedent did not rely on any affirmative action taken by the police, because she never contacted them and "had no knowledge of a promise [of help] on which she could rely." *Id.* at 7. The dissent argued that a strict application of the victim reliance requirement "to crimes in progress, . . . leads to an odd unjust result where the victim least able to help himself, that is, least able to

---

9. In that case, neighbors of the decedent called 911 to report they heard screams and calls for help coming from the apartment of the decedent and her husband, and they saw a man with a gun near the apartment. When police officers arrived, one of the callers "buzzed them in," but another tenant who encountered them in the hallway reported that everything was quiet. The officers left without going up to the decedent's seventh floor apartment to check on her welfare. Within a short time, one of the earlier complainants called 911 to say that the police had not yet responded and that emergency assistance was needed. The 911 dispatcher contacted the same officers, who stated that all was well and under control. They did not investigate further. The next morning, the neighbors discovered the body of Ms. Merced, who bled to death from a gunshot wound. *See Merced v. City of New York*, 142 Misc.2d 442, 534 N.Y.S.2d 60, 61–62 (Sup.1987), *rev'd*, 75 N.Y.2d 798, 552 N.Y.S.2d 96, 551 N.E.2d 589 (1990).

10. In that case, a divided appellate court considered a claim by a decedent whose neighbors called 911 on her behalf after they saw the victim's husband attack her and heard her cries for help. The responding officers met with the neighbors, but left without knocking on the victim's apartment door or making any other attempt to contact her. Less than three hours later, the victim's husband called 911 to report that he had stabbed his wife, who died three hours and twenty minutes after the first officers had arrived. *See White v. Beasley*, 453 Mich. 308, 552 N.W.2d 1, 3–4 (1996).

change the course of his actions, is the one least able to 'rely' on the police officer's obligation to help him." *Id.* at 10. The majority rejected the notion that evidence of reliance on a police officer's generalized "obligation to help" is sufficient to establish a special duty. A claim premised solely on the argument that "it was the officer's 'duty' to aid victims of crime . . . . is tantamount to arguing that a tort duty can be established solely on the basis of defendants' job title." *Id.* at 7. Holding that "the public duty doctrine . . . protect[s] government employees from liability based solely on their job title," the Court "refuse[d] to allow the exception to contradict the rule." *Id.*

Nevertheless, there appears to be a few circumstances in which courts have eschewed an "overly rigid" application of the requirement of detrimental reliance by the victim. *See, e.g., Lauer v. City of New York,* 95 N.Y.2d 95, 711 N.Y.S.2d 112, 733 N.E.2d 184, 196 (2000) (dissenting opinion) ("While direct contact is necessary, this Court has not been overly rigid in its application, taking the particularities of each case into consideration"); *Cuffy,* 513 N.Y.S.2d 372, 505 N.E.2d at 940 (same). The rationale for permitting a third party's detrimental reliance to satisfy the special duty test appears to be that the third party caller's proximity and close relationship with the victim, and the nature of the victim's peril, afforded the caller a significant opportunity to become a "rescuer." In such cases, by promising assistance, but failing to reasonably provide it, emergency personnel may not merely fail to confer the benefit of their assistance; instead, they also may increase the peril by depriving the victim of assistance that reasonably could have been expected from another source—the caller and would—be rescuer. *See Merced,* 552 N.Y.S.2d 96, 551 N.E.2d at 590 (citing *Sorichetti v. City of New York,* 65 N.Y.2d 461, 492 N.Y.S.2d 591, 482 N.E.2d 70, 76 (1985) (special duty arose as result of mother's reasonable reliance on police who promised help in recovering infant daughter abducted by abusive husband who was subject to protective order)).

One case in which detrimental reliance by a third party caller presented a jury question is *Koher v. Dial,* 653 N.E.2d

524 (Ind.App.1995). A police radio dispatcher failed to dispatch an ambulance in response to a wife's report that her husband was having a heart attack. In reliance on the dispatcher's promise that an ambulance would be sent immediately, neither the wife nor her neighbors transported the husband to a nearby hospital. Seventeen minutes after her 911 call, the wife called the fire department, which sent an ambulance that arrived one minute later. *See id.* at 525. The delay in medical treatment allegedly caused permanent heart damage. Plaintiffs later learned that due to the annual sheriff's department picnic, the police dispatcher was an untrained substitute who never dispatched the promised ambulance.

The appellate court concluded that summary judgment was not appropriate on the special duty issue, because there was evidence that the wife and neighbors decided not to transport the husband to the hospital or delayed seeking other ambulance services, in reliance on the dispatcher's promise to send an ambulance immediately. *See id.* at 527. The *Koher* Court reasoned that the wife's reliance on the dispatcher's promise of such assistance could satisfy the detrimental reliance component of the special duty test because the wife and neighbors remained ready, willing, and able to aid the victim, but delayed their rescue efforts for a brief period in the expectation that an ambulance would be sent.[11]

A number of factors may have been relevant to the *Koher* court's decision to permit a special duty claim based on third party reliance, including (1) the close personal relationship of the third party caller to the victim (i.e., wife-husband), (2) the caller's continuing presence at the scene to render aid to the victim and to ensure that emergency personnel reached the victim, (3) the caller's reliance on the dispatcher's promise of help in temporarily ceasing efforts to obtain assistance and in

---

11. Indiana has since enacted an immunity statute covering claims against a governmental entity arising from the "development, adoption, implementation, operation, maintenance, or use of an enhanced emergency communication system." *See, e.g., Burns v. City of Terre Haute,* 744 N.E.2d 1038 (Ind.App.2001) (911 dispatcher who sent ambulance to wrong address had statutory immunity under I.C. § 34–13–3–3(18)).

not attempting an "easy rescue" (*i.e.*, transporting the victim herself), and (4) the caller's continuation of those efforts when she realized that the promised assistance had not arrived. Together, these factors indicate that the third party had a continuing willingness and ability to rescue the victim. In these circumstances, a fact finder might conclude that the third party's reliance on the promise of emergency assistance increased the victim's peril by depriving the victim of assistance that reasonably could have been expected from that third party.

For the reasons set forth below, however, we shall leave the resolution of this "transferred reliance" question for another day. We conclude that we need not decide whether a third party's detrimental reliance can create a special duty to rescue, because, even if we assume that it could, the third party reliance in this case did not do so. Accordingly, we shall assume, without deciding, that Tiffany's assailants did detrimentally rely on Archer's promise to "send someone out," by foregoing their opportunities to rescue Tiffany on the expectation that the police would do so.

## C.

### Appellant Did Not Establish Specific Reliance Because The Callers Did Not Justifiably Rely On The Dispatcher's Promise

██ Applying the second prong of the reliance test to the uniquely tragic circumstances of this case, we conclude that appellant cannot establish that these third party callers justifiably relied on Archer's promise to "send someone out." An assurance that an officer will be sent out is not necessarily an assurance that the officer can and will remove the victim from her peril. If such an assurance creates an expectation of rescue on the part of the third party who called for assistance, any reliance on that expectation must have been warranted under the circumstances. *See, e.g., Mullin*, 639 N.E.2d at 284 (contact "must be such that the governmental entity has induced the injured person justifiably to rely on its taking

action for the benefit of that particular person to his detriment"). Here, the pleadings show that any expectation by these assailants that Archer's promise to send an officer to 1436 K Court would result in a police rescue of their victim was unreasonable and unjustified as a matter of law.

It is undisputed that these third party callers deliberately reported inaccurate information regarding the location and condition of their victim. They intentionally provided an invented address that did not exist. When Archer asked for an exact street address and mentioned "Harford Square," they did not tell her the other name for K Court—"Charleston Drive." Moreover, they did not tell Archer that Tiffany was unconscious and partially undressed, that they had assaulted her, or that she was in no condition to "rescue herself" by simply coming inside.

Although they knew or should have known that the police had inaccurate and incomplete information regarding Tiffany's location and condition, the callers blithely assumed that the police would figure out where she was. When they checked on her "once," she was still lying there unconscious. Knowing that the police had not found her, and aware of the life threatening weather conditions, they made plans to bring her inside. When Eric's mother refused to let her son go outside, all three of them abandoned their rescue plans. They made no further effort to find out whether the police had located and rescued Tiffany, to aid or rescue Tiffany, to recontact the HCSO, or to summon another rescuer. Instead, they callously left her outside to die, while they enjoyed shelter just a short distance away.

 This, they were not entitled to do. They had an affirmative, nondelegable duty to rescue the girl they had abused, assaulted, imperiled, and abandoned. *See Groninger, supra,* 26 Pepp. L.Rev. at 374 n. 225. As a matter of law, assailants who request help on behalf of their victim cannot "justifiably" rely on a generalized promise to send an officer in deciding to leave their victim in the peril that they created.

Their reliance on Archer's promise to "send someone out" was unquestionably unjustified.

We would reach the same result, however, even if these third parties had not been Tiffany's assailants. First, third parties who intentionally provide inaccurate and incomplete information regarding the person in need of assistance cannot "reasonably" rely on their unconfirmed expectation that, despite such information, help will arrive. Second, third parties who request help on behalf of a victim may not "reasonably" rely on a promise of assistance when they permanently, rather than temporarily, abandon their rescue efforts. Reliance is not justifiable when the promise of assistance does not prevent the third parties from taking steps to help the victim once they know or should know that the promised assistance was not given. *See, e.g., Cuffy,* 513 N.Y.S.2d 372, 505 N.E.2d at 942 (family did not justifiably rely on police assurances of protection "first thing in the morning" where police did not come and family was not attacked until the next evening, because family was not "trapped and unable to take steps to protect itself when its members knew or should have known that police assistance would not be forthcoming"); *Merced,* 552 N.Y.S.2d 96, 551 N.E.2d at 590 (municipality's promise to send police officers to investigate did not "deprive[ ] decedent of assistance that reasonably could have been expected from another source," including neighbors who called to report assault); *Huston v. Montgomery County,* 1995 WL 766308, 1995 U.S. Dist. LEXIS 19248 (E.D.Pa.1995) (dispatcher's error in sending ambulance to wrong address did not deprive decedent of assistance from fiancee who called for help, because it did not "actively prevent[ ] . . . fiancee from seeking help from other sources").

Here, it is clear that Archer's promise of assistance did not increase Tiffany's peril by depriving her of assistance that reasonably could have been expected from these third parties. Archer's promise to send an officer to the fictitious address they provided did not prevent them from determining whether Tiffany had been rescued, nor did it prevent them from

seeking other assistance, nor did it prevent them from providing assistance themselves. At best, these third parties merely had a generalized expectation that their call would result in a police rescue. Even assuming that this expectation was justified for a brief period, it did not remain justifiable "forever." To the extent that Archer's promise created an expectation of rescue, the continuation of that expectation without any effort to determine whether the rescue occurred was not justified under the circumstances.

Sad and difficult as this case is, we conclude that the criminal and civilly unjustified acts of these third party callers cannot establish the specific reliance necessary to impose a special duty on this police dispatcher. We are in agreement with the recent comments of the New York Court of Appeals that

> [w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.... Fixing the orbit of duty may be a difficult task. Despite often sympathetic facts in a particular case ..., courts must be mindful of the precedential, and consequential, future effects of their rulings, and "limit the legal consequences of wrongs to a controllable degree." Time and again we have required "that the equation be balanced, that the damaged plaintiff be able to point the finger of responsibility at a defendant owing, not a general duty to society, but a specific duty to him."
>
> This is especially so where an individual seeks recovery out of the public purse.

*Lauer,* 711 N.Y.S.2d 112, 733 N.E.2d at 187–88 (citations omitted). We shall affirm the trial court's dismissal of appellant's claims against Archer.

## D.

### Appellant Did Not Allege Reliance On HCSO's Training And Procedures For Emergency Personnel

Appellant argues that appellee Terrell had a special duty "by virtue of the foreseeability of harm resulting from a

potential failure to establish proper policies, procedures and safeguard with respect to the training of emergency dispatch operators. . . ." There are no allegations indicating that Tiffany or her assailants specifically relied on Terrell's allegedly insufficient training and procedures. For the same reasons discussed in parts II and III.C., we hold that appellant's negligent training allegations do not allege the breach of a private duty of care against Terrell.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**