*James E. Bailey v. City of Annapolis, et al.*, No. 2311, September Term, 2019. Opinion by Adkins, Sally D., J.


**IMMUNITY—PUBLIC OFFICIAL IMMUNITY—DISCRETIONARY VERSUS MINISTERIAL DUTIES:** Police officers are entitled to common law public official immunity for discretionary acts done without malice. When an officer acts on the obedience of orders without any room for personal judgment or discretion, the action is ministerial, and thus not protected by public official immunity. Here, a police officer acted in a ministerial capacity when applying for a new, corrected warrant based on specific direction to do so by a judge. Under these circumstances, he was not entitled to public official immunity.

**TORT—GROSS NEGLIGENCE—PLEADINGS:** Gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another. A claim of gross negligence does not arise from allegations of negligence without meeting the higher standard for gross negligence. The facts alleged here did not state a cause of action for gross negligence.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2311

September Term, 2019

_____

JAMES E. BAILEY

v.

CITY OF ANNAPOLIS, et al.

_____

Reed,
Beachley,
Adkins, Sally D.
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Adkins, Sally D., J.
_____

Filed: September 1, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

James Elmer Bailey was twice arrested—based on two separate warrants—for a crime he did not commit. The suspect just happened to share his name and date of birth. After the second arrest, Bailey filed suit against Sergeant Christopher Kintop, the officer who applied for both warrants. He also filed suit against Jamekica Mackall, Kathleen Buchanan, and Britney Lane, police personnel involved at varying levels, as well as the City of Annapolis (collectively "Appellees"). The circuit court dismissed some charges and granted summary judgment against Bailey on the rest.

Bailey presented us with three questions,[1] which we rephrased and separated:

> 1. Did the circuit court err by dismissing the malicious prosecution claims against Kintop?

---

[1] Bailey's questions are as follows:

> 1. Whether the Court erred as a matter of law in granting Defendants City of Annapolis, Kintop, Buchanan, Lane and Mackall's Motion to Dismiss Count VIII (Malicious Prosecution), Count IX (Gross Negligence), Count X (Gross Negligence), Count XI (Gross Negligence), and Count XII (Gross Negligence), where Appellant's Second Amended Complaint fully stated facts, amounting to legally sufficient causes of action, for which relief may be granted.
>
> 2. Whether the Court erred in granting Defendants City of Annapolis' and Kintop's Motion for Summary Judgment as to Count I (Negligence) through the application of Public Official Immunity when Sgt. Kintop's actions were all ministerial in nature.
>
> 3. Whether the Court erred in granting Defendants City of Annapolis, Buchanan, and Mackall's Motion for Summary Judgment as to Count II (Negligence) and Count III (Negligence) through finding that Ms. Buchanan and Ms. Mackall did not owe Mr. Bailey a private duty in tort.

2. Did the circuit court err by dismissing the gross negligence claims against Kintop, Buchanan, Mackall, and Lane?

3. Did the circuit court err by granting summary judgment on the negligence claim against Kintop by applying public official immunity?

4. Did the circuit court err by granting summary judgment on the negligence claims against Buchanan and Mackall by finding that they did not owe a duty to Bailey?

For the reasons that follow, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

*The First Warrant*

On March 14, 2007, a man assaulted Kimberly Sharper in Annapolis, injuring her eye. She went to the Anne Arundel Medical Center two days later to seek treatment. Kintop interviewed her about the incident on March 16, 2007. Sharper knew her assailant; she told Kintop that James Elmer Bailey assaulted her. She described him as a Black male born on October 15, 1962, approximately 5'5" and 145 pounds, living at 26 College Creek Terrace in Annapolis.

Kintop prepared an incident report and filed an application for statement of charges within a few days. After consulting with dispatch on height and weight, Kintop described the suspect[2] (hereinafter "Suspect Bailey") on the application as a 6'3" Black male weighing 195 pounds. He assumed Sharper was confused, and explained the discrepancy

---

[2] We refer to this James Elmer Bailey as "Suspect Bailey" only to differentiate him from the plaintiff/appellant in this case. We intend to make no suggestion about his guilt or innocence of the crime alleged.

in a later deposition that "a description given by a witness may not be accurate on height and weight."

Little did he know that there were two people named James Elmer Bailey born on October 15, 1962, living in the Annapolis area. The court issued a warrant on March 23, 2007 ("2007 Warrant"). A police dispatcher who entered the warrant into the National Crime Information Center ("NCIC") database informed Kintop that there was only one James Elmer Bailey—and he was white. Later, Kintop initialed the warrant to change the suspect's race to white, believing that Sharper was once again mistaken.

In July 2010, Annapolis City Police Officers arrested Bailey at his home in Edgewater. Bailey insisted that he was not the right person—he had been mistaken for Suspect Bailey in the past due to their date of birth and name. Back at the station, an officer quickly realized that they had the wrong Bailey after looking at the warrant file. The department released him shortly after.

Bailey filed suit against Kintop and the officers involved in November 2011. The parties went to trial on February 19, 2013. The court held the civil suit for deliberation,[3] but on the day of its trial, expressed its desire for the administrative commissioner to strike the 2007 Warrant and reissue a new, correct warrant with Suspect Bailey's information.

---

[3] The court issued its order from the February 2013 trial on March 10, 2014. It found that Bailey's federal and state constitutional rights were violated and awarded Bailey $4,500 in damages.

*The Second Warrant*

On the very same day as trial, Kintop filed a new application for statement of charges using the correct height, weight, and race of Suspect Bailey. The district court issued a warrant later that evening ("2013 Warrant").

About three years went by; the mishap appeared to be over. In 2016, Mackall entered the warrant for Suspect Bailey into the NCIC database. To do so, Mackall had to "find identifiers"—"[n]ame, date of birth, two identifiers is all you needed." According to her testimony, Mackall "look[s] for the warrant itself on the computer" in their in-house record system, InPursuit. Then, she "click[s] on the name and it pops up" and she verifies the "name and date of birth" of the individual. While InPursuit has other information, "the only part that [she] really check[s] is . . . the name, date of birth, the address."

When Mackall entered the information into the NCIC database, she verified "[h]is name and date of birth." To her recollection, there were no notes or special instructions; she did not see the 2007 Warrant or any reference to it. Because the 2013 Warrant was already in InPursuit, she "didn't have to look for" anything else. She then went into the Motor Vehicle Administration ("MVA") records and entered "the name and date of birth." Only one Bailey came up—and it was not Suspect Bailey. She entered the MVA records into the NCIC database in connection with the warrant. Once Mackall finished entering the information, she "made a packet, because it [had] to have all the information to go with the warrant, and [she] gave it to [her] supervisor," Buchanan.

Buchanan reviewed the information for the 2013 Warrant. Buchanan looked over the packet Mackall gave her to verify the name and date of birth. Satisfied that the "name

and the date of birth matched," Buchanan "never gave James Elmer Bailey another thought[.]"

The 2013 Warrant, unfortunately, gave Bailey more than another thought. On April 21, 2017, Maryland Transportation Authority officers stopped Bailey on the Bay Bridge. The officers notified him that "he had been stopped because there was an active warrant for his arrest[.]" Bailey insisted that he was not the person described in the warrant—emphasizing the stark differences in physical appearances between the two James Elmer Baileys. The officers called the Annapolis Police Department to verify the validity of the warrant, and Lane confirmed that the warrant was still active and faxed it over. Officers proceeded to arrest Bailey, transport him to the Maryland Transportation Authority, and place him in a holding cell.

One of the officers who detained Bailey was confused about the warrant—he noticed that it was for a Black male, and Bailey was white. He called Lane back, asking about the discrepancy. Lane contacted Kintop, who told her that if the detainee was white, they had the wrong James Elmer Bailey. She then explained the discrepancy to the officers at the Maryland Transportation Authority and told them to release him.

Bailey provided notice to the City of Annapolis and State of Maryland of his claims under the Local Government Tort Claims Act and the Maryland Tort Claims Act. The Maryland Treasurer and Annapolis both promptly denied his claims after investigation. Bailey filed suit in September 2018. The trial court dismissed eight of Bailey's twelve counts in June 2019, and granted summary judgment against Bailey on the other four in

January 2020. This appeal followed, challenging both the dismissals and grants of summary judgment.

## STANDARD OF REVIEW

When reviewing the grant of a motion to dismiss, our standard of review is whether the trial court was legally correct: "we must determine whether the complaint, on its face, discloses a legally sufficient cause of action. In reviewing the complaint, we must presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom." *Schisler v. State*, 177 Md. App. 731, 742–43 (2007) (cleaned up).

When reviewing the grant of a motion for summary judgment, we "focus on whether the trial court's grant of the motion was legally correct." *Laing v. Volkswagen of America, Inc.*, 180 Md. App. 136, 152–53 (2008). We analyze "whether a fair[-]minded jury could find for the plaintiff in light of the pleadings and the evidence presented, and there must be more than a scintilla of evidence in order to proceed to trial." *Id.* at 153 (cleaned up). In a situation where "the facts are susceptible to more than one inference, [we] must view the inferences in the light most favorable to the non-moving party." *Id.*

## DISCUSSION

### Malicious Prosecution

Bailey argues that the circuit court erred by dismissing his claim of malicious prosecution against Kintop because he properly asserted a legally sufficient cause of action. Appellees respond that Bailey failed to state a claim for malicious prosecution because criminal proceedings were never instituted against him personally.

-6-

A claim for malicious prosecution requires: "1) a criminal proceeding instituted or continued by the defendant against the plaintiff; 2) without probable cause; 3) with malice, or with a motive other than to bring the offender to justice; and 4) termination of the proceeding in favor of the plaintiff." *Candelero v. Cole*, 152 Md. App. 190, 199 (2003) (cleaned up). Bailey argues that Kintop instituted and continued proceedings against him. Appellees respond that Bailey failed to sufficiently plead "that he was the subject of the 2013 Arrest Warrant."

To address these contentions properly, we look at malicious prosecution in more depth. Malicious prosecution is distinguished from other related torts, such as false arrest and false imprisonment, by the actions underlying the claim:

> Traditionally at common law, actions of malicious prosecution and false imprisonment have been directed at different interests. "False imprisonment is the invasion of the interest in freedom from unlawful confinement, while a malicious prosecution is *the unlawful use of legal procedure to bring about a legal confinement*."

*Montgomery Ward v. Wilson*, 339 Md. 701, 723–24 (1995) (emphasis added) (citing Harper, James & Gray, *The Law of Torts* § 3.9 at 297 (2d ed. 1986)).

The focus is on the unlawful use of procedure: "[a] person who procures a facially valid warrant for another's arrest thereby initiates legal process *against the person to be arrested*." *Wilson*, 339 Md. at 724 (emphasis added). "[F]alsely procuring an arrest through wrongfully obtaining a warrant is ordinarily malicious prosecution." *Id.* The *Wilson* court detailed the claim further:

> [A] malicious prosecution action against [a] third party will lie if the [third party] acted out of malice, *i.e.,* acted from a

wrongful or improper motive [while wrongfully procuring a warrant]. Furthermore, if in this situation there was no malice, but the third party procured the warrant as a result of negligence, the wrongfully arrested plaintiff may recover damages from the procurer in an action for negligence.

*Id.* at 727.

Improperly obtained warrants are a common theme in successful malicious prosecution claims. *See, e.g.*, *First Nat'l. Bank of St. Mary's v. Todd*, 283 Md. 251, 254 (1978) (after a bank failed to hold a check as agreed, the bank obtained a warrant against the check drawer for insufficient funds); *Zablonsky v. Perkins*, 230 Md. 365, 366–70 (1963) (a defendant obtained a warrant against a plaintiff renting his performance space following the disappearance of equipment, despite having insufficient grounds to believe the plaintiff stole the equipment); *Glover v. Fleming*, 36 Md. App. 381, 382–85 (1977) (a company official applied for a warrant for an employee without sufficient evidence); *Derby v. Jenkins*, 32 Md. App. 386, 387–89 (1976) (a party obtained a warrant for larceny against his family members, who were merely retrieving their lawfully owned possessions). Claims can also stem from the actions of police officers during their investigations. *See, e.g.*, *Prince George's Cnty. v. Longtin*, 419 Md. 450, 460–64 (2011) (officers continued to imprison and investigate a party after discovering and failing to disclose exculpatory evidence, as well as misconstruing his responses in a statement of probable cause).

The initial issue before us—whether a proceeding was instituted against Bailey after his arrest for a warrant appearing to identify someone else—is not one we have directly addressed in Maryland. A court in Georgia considered a similar situation in *Wilson v. Bonner*, 303 S.E.2d 134 (Ga. App. 1983). There, a clerk at K-Mart accepted a check from

an individual named Joyce Wilson; the check was subsequently not honored by the bank

"because no such account existed at the time [it was] presented for payment." *Id.* at 137.

Parties from K-Mart then obtained a warrant for the arrest of Joyce Wilson for passing a

bad check. *Id.* The warrant used the address printed on the fraudulent check. *Id.* at 137–

38.

The appellant, also named Joyce Wilson, was not a resident of the address on the

warrant. *Id.* at 138. She was arrested at a different location. *Id.* After she was released

from jail, the parties from K-Mart "received certain information which, for the first time as

to them, raised the question of whether appellant was in fact *the* Joyce Wilson who had

passed the bad checks." *Id.* (emphasis in original). The solicitor's office still prepared

charges against the appellant; which were eventually dropped because of Wilson's

mistaken identity. *Id.*

Wilson sued for malicious prosecution. *Id.* The Court of Appeals of Georgia held

that "the original warrants obtained by appellee-K-Mart and appellee-Lionel for the arrest

of Joyce Wilson cannot serve as the basis for appellant's malicious prosecution action."

*Id.* The *Bonner* Court further differentiated the claim:

> This is an action for malicious prosecution. It involves
> mistaken identity. The evidence is uncontradicted that there
> never was a warrant issued for the arrest of the plaintiff in this
> case. The fact that the defendants, with probable cause,
> obtained a warrant meant for another person having the
> identical name of plaintiff cannot be expanded to infer that the
> defendant[s] intended maliciously for just *any* person of that
> name *or this plaintiff* to be prosecuted for the offense.

*Id.* (emphasis in original) (quoting *Massey Stores v. Reeves*, 141 S.E.2d 227, 228 (Ga. App. 1985)). Further, because "the uncontradicted evidence shows that there never was a warrant sworn out charging this appellant, the plaintiff in this case, with passing bad checks, it follows that as to her there was *no* warrant." *Bonner*, 303 S.E.2d at 138 (cleaned up). The *Bonner* Court relied on cases holding "a suit for malicious prosecution will not lie against a prosecutor where there was in fact no warrant at all issued on the prosecutor's accusation for the arrest of the person of the plaintiff bringing the action." *Id.* (citing *Massey Stores*, 141 S.E.2d at 230).

We consider *Bonner* analogous. The 2013 Warrant specifically named Suspect Bailey and included Suspect Bailey's name, date of birth, height, weight, race, and last known address. Like the appellant in *Bonner*, Bailey shared the same name as the subject of the warrant. Bailey even shared the same date of birth. But this warrant was void as to Bailey: Bailey became connected to the warrant by a clerical mistake, not by a purposeful prosecution. This was an unfortunate case of mistaken identity. For all intents and purposes, Kintop applied for a valid warrant for Suspect Bailey. We see no purposeful action by Kintop to institute legal proceedings against *this* James Elmer Bailey, or any intent to facilitate his arrest. *See Wilson*, 339 Md. at 724 (quoting Harper, James, & Gray, *supra*, at 297) ("[A] malicious prosecution is the unlawful use of legal procedure to bring about a legal confinement."). Shortly after Bailey was arrested in 2017, Kintop confirmed that Bailey was not the subject of the warrant. Kintop initiated legal process against Suspect Bailey—the true subject of the warrant.

There was no proceeding instituted or continued against Bailey from his arrest in 2017. The Maryland Transportation Authority officers released Bailey as soon as they discovered he was not the subject of the warrant. Bailey was not formally charged, nor was he brought before a court on Suspect Bailey's charges. Bailey was mistakenly arrested based on a warrant for someone else with the same name and date of birth—the actual person Kintop instituted proceedings against. Thus, there were no proceedings ever instituted or continued against this James Elmer Bailey. We affirm the trial court as to the count for malicious prosecution.

## Gross Negligence

Bailey asserts that the court erred by dismissing his claims for gross negligence against Appellees because he sufficiently pleaded reckless disregard for the accuracy of the information in the 2013 Warrant's application. He also asserts that the amended complaint was sufficient to show actual malice and intent to do harm. Appellees respond that Bailey's claims fall short, and that his amended complaint fell short because his claim of gross negligence was based on mere conclusory allegations.

Gross negligence is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Howard v. Crumlin*, 239 Md. App. 515, 529 (2018) (cleaned up). A party "is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such

rights did not exist." *Id.* The consequences must still be foreseeable: "[o]ne cannot act in reckless disregard of consequences of which she or he is unaware." *Id.*

The Court of Appeals addressed gross negligence in the context of law enforcement officers in *Barbre v. Pope*, 402 Md. 157 (2007). Deputy Sheriff Mark Barbre tried to stop a truck driven by Andrew Pope, III for an apparent traffic violation. *Id.* at 162–63. Pope declined to stop, and Barbre followed Pope all the way to his home, where Pope eventually exited his vehicle and "raised his hands in surrender." *Id.* at 163. Despite his signal of defeat, "Barbre approached Pope with his gun drawn and fired a single shot, striking Pope in the neck." *Id.* Pope, who was paralyzed as a result of the shot, sued Barbre for gross negligence, among other things. The Court of Appeals analyzed whether Pope "presented sufficient allegations of gross negligence" to defeat Barbre's immunity defense. *Id.* at 187. It held that because "Barbre ordered Pope, who was unarmed, to raise his hands and that after Pope complied with the request, Barbre approached with his gun drawn and shot him in the neck, [the evidence] could support an inference that Barbre acted grossly negligent." *Id.* at 190. This action by Barbre, on its face, was unexplainable in light of the obvious risk of bodily injury to Pope from Barbre's gun and readily met the reckless disregard standard for gross negligence.

The Court of Appeals revisited gross negligence in the law enforcement context again in *Cooper v. Rodriguez*, 443 Md. 680 (2015):

> This case concerns the brutal murder of an inmate [Philip Parker, Jr.] by another inmate during a ride on a prison transport bus that was staffed by five correctional officers. At core, the issue is whether the correctional officer who was in

> charge of the bus was grossly negligent and, if so, whether he is entitled to common law public official immunity.

*Id.* at 686. In the events preceding the murder, prison officials transported four prisoners to a sentencing hearing: Kevin Johns, the subject of the hearing, and three inmates, one being Parker, testifying on his behalf. *Id.* at 688. The court sentenced Johns to life without parole for murdering his cellmate. *Id.* Multiple officers heard Johns remark on that day that "the killing has just begun." *Id.* at 689.

On the way back, the prisoners boarded a State-owned prison bus, which was modified to have secured compartments and give officers better views of the interior of the bus. *Id.* at 689–90. Thirty-two other inmates joined the passengers on the bus, which had five total officers on board. *Id.* at 690. In a violation of the Maryland Department of Public Safety and Correctional Services' policy, multiple Supermax inmates were seated next to each other at the back of the bus, and not in the enclosed security cages or in the front. *Id.* at 691. At some point during the ride, "Johns got up from his seat, reached over the seat in front of him, hooked his arm around Parker's head from behind, . . . and began choking Parker with his arm." *Id.* at 692. He also "cut Parker's neck" with a razor blade smuggled onto the bus. *Id.*

At trial, the jury found, among other things, that one of the officers, Sergeant Larry Cooper, was grossly negligent. *Id.* at 703–04. But the trial court granted Cooper's motion to strike the finding of gross negligence, reasoning that no evidence supported the notion. *Id.* at 704. We disagreed and held that the complaint adequately asserted a claim of gross

negligence and the Court of Appeals affirmed. *Id.* at 704–05, 709. In the words of Judge

Watts, writing for the Court:

> [T]he record overflows with facts sufficient to support the finding of gross negligence as to Cooper. Cooper failed to follow basic procedures. Expert testimony established that, as the Officer in Charge, Cooper was responsible for ensuring that the three-point restraints placed on inmates were properly secured. It is undisputed that Surgeon improperly secured the three-point restraint device on Johns, and Cooper did not check the restraints. Next, although according to DPSCS policy, Supermax inmates such as Johns and Parker were to ride in the protective custody cages located at the front of the bus, or, absent space in a protective custody cage, were to ride in the front of the bus, Cooper violated DPSCS policy by allowing Supermax inmates Johns, Folk, Parker, and Diggs to sit on the two benches at the rear of the bus. According to Cooper, he "did the best [he] could with what [he] had" concerning the seating arrangements on the bus. And, as the Officer in Charge, Cooper was required to sit at the front of the bus instead of in the rear elevated cage.

*Cooper*, 443 Md. at 710–11.

The Court went on to conclude:

> Indeed, the evidence was sufficient to support the conclusion that Cooper, who claimed to have not seen or heard the attack occurring right in front of him, and who testified that he was unaware of several policies meant to ensure inmates' safety, was "so utterly indifferent to the rights of others that he act[ed] as if such rights did not exist." [*Barbre*, 402 Md. at 187]. Whether Cooper knew of Johns's propensity for violence before the transport began is inconsequential where the evidence was sufficient to support the rational inference that, after the bus began its trip to Supermax, Cooper's actions constituted gross negligence.

*Id.* at 712 (cleaned up).

*Cooper* and *Barbre* are helpful to understand circumstances when law enforcement personnel can be grossly negligent. We recognize, however, that both *Cooper* and *Barbre*—reflecting a callous and reckless disregard for the safety of the inmates and arrestees—are a far cry from the actions of any of the Appellees here.

A case more in the realm of the present one is *Torbit v. Baltimore City Police Dept.*, 231 Md. App. 573 (2017), where we revisited gross negligence. There, we analyzed a gross negligence claim against Major Marc Partee,[4] a Baltimore Police Officer called to a nightclub "after several fights had broken out inside[.]" *Id.* at 579–80. He closed the club early, sent the club's guests home, and set up a police perimeter around the club and nearby parking lot. *Id.* at 580. Arguments later broke out nearby, and a man began to fire his weapon "indiscriminately with his arm parallel to the ground." *Id.* at 580–81. Officer Toyia Williams and three other police officers fired their weapons at the shooter, who was fatally wounded. *Id.* at 581, 593. The fatally wounded person turned out to be Baltimore Police Department Officer William Torbit, a plainclothes officer at the scene. *Id.* at 581.

At trial, the plaintiffs presented an expert witness who testified: "(1) that a supervising officer has a duty to give orders and make sure those orders are carried out; (2) that, in his opinion, no perimeter was set up outside the club and; (3) that Major Partee failed to give adequate instruction" to Torbit "as a plainclothes police officer." *Id.* at 589.

---

[4] *Torbit* only addressed a gross negligence claim against Partee and did not discuss ordinary negligence against Partee. *See Torbit v. Baltimore City Police Dept.*, 231 Md. App. 573, 588 (2017).

The appeal addressed whether there was sufficient evidence to support a claim for gross negligence against Partee—not the shooter—for the manner in which he supervised the other officers, including Williams. The trial court granted judgment in favor of Partee on the gross negligence claim. *Id.* at 587.

We considered "whether a reasonable juror could conclude that Major Partee's conduct strayed so grossly from the ordinary standard of care as to support a finding of utter indifference to the rights of others." *Id.* at 589. In affirming the trial court, we said:

> Major Partee may have failed to properly command his subordinate police officers, but there was no evidence that he didn't instruct them because he didn't care. He may have failed to set up a perimeter, but there was no evidence that this failure amounted to gross disregard for the lives of Appellants. He may not have adequately instructed Officer Torbit on how to behave while Torbit was in plainclothes, but there is no evidence that this was because he had reckless disregard for Torbit's safety. Thus, even if we were to accept Appellants' factual assertions that Major Partee failed to act in these several respects, we agree with the trial court that no reasonable juror could find his conduct constituted gross negligence.

*Id.* at 589–90. We focus on the language in the above opinion that there was "no evidence that he didn't instruct them because he didn't care" and consider below whether there is evidence in the record that "absence of caring" was involved.

*Kintop*

Bailey's primary allegations against Kintop to support gross negligence were that he 1) "deliberately made no effort to further investigate" Sharper's claims prior to applying for the 2013 Warrant; 2) "knew there was not an individual named James E. Bailey that was 5'5" and 145 lbs. in the 'system,'" yet still applied for the 2013 Warrant; and 3) "did not attempt to ensure the correct identifying information was used" for the 2013 Warrant "after causing it to be issued." He relies primarily on *Cooper*[5] and *Beall v. Holloway-Johnson*, 446 Md. 48 (2016) to support his claim for gross negligence.

In 2013, Kintop applied for a warrant for a Black James Elmer Bailey born on October 15, 1962, who was 5'5" and weighed 145 pounds. He included a last known address of 26 College Creek Terrace. Sharper directly provided all of this information to him. The 2013 Warrant did share similarities with the 2007 Warrant: both were men named James Elmer Bailey and born on October 15, 1962, living in the general vicinity of Annapolis.[6]

It is most unfortunate that Bailey was stopped by the police and taken to the station twice in connection with a crime he did not commit. The confluence of circumstances occurring over a six-year period reveals some vulnerability in the law enforcement systems designed to provide security to the public. The second arrest of Bailey might have been

---

[5] Appellant primarily cites to the Court of Special Appeals version of this case. *See Rodriguez v. State*, 218 Md. App. 573 (2014).

[6] Bailey also alleged in his complaint that Kintop used his social security number while applying for the 2013 Warrant. Neither Kintop's application nor the actual warrant itself have a social security number.

avoided if Kintop or another state actor had anticipated that correcting the identifying information on the warrant would not be sufficient, in itself, to avoid another misidentification and arrest of Bailey as the police searched for Suspect Bailey. Arguably a method could have been devised to flag the potential for confusion when the databases were utilized.[7] Yet we must apply the applicable tort law to Bailey's claim for monetary damages from gross negligence. As we said above, a monetary claim for gross negligence requires that there be evidence that the defendant "strayed so grossly from the ordinary standard of care as to support a finding of utter indifference to the rights of others." *Torbit*, 231 Md. App. at 589. It also requires "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and . . . implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Howard*, 239 Md. App. at 529 (quoting *Cooper*, 443 Md. at 708).

In his brief, Bailey cites this Court's observation that "[w]hether or not gross negligence exists necessarily depends on facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached." The facts in *Beall*, however, were markedly different: the defendant police officer was acting against his superior's orders by continuing to pursue a motorcyclist during a long chase resulting in the death of the

_____

[7] We discuss below, in the section on ordinary negligence whether Kintop should have assessed the risk that there might be further confusion arising from databanks utilized by police and have taken further corrective action.

-18-

motorcycle driver when the defendant's automobile ran into him from the rear.[8] *Beall*, 446

Md. at 57–59.  In the Court's words:

> Ms. Holloway-Johnson relied specifically . . . on the actions of
> Officer Beall prior to the collision to show that he was acting
> recklessly.  Officer Beall commenced trailing the motorcycle
> surreptitiously and started active pursuit only after Holloway–
> Lilliston "popped a wheelie" and sped away.  Officer Beall's
> conduct concededly was in violation of BCPD General Order
> 11–90 . . . as he was acting without exigent circumstances in
> his pursuit of Holloway–Lilliston, who committed only traffic
> offenses and posed no articulated immediate harm to others.
> Additionally, evidence was presented to show that Holloway–
> Lilliston reduced his speed upon entering the construction zone
> on I–695 East; yet, Officer Beall continued to follow him in
> contravention of a directive from his Shift Commander to
> discontinue pursuit and allow the State Police to handle the
> "traffic incident."

*Id.* at 65–66.  None of the circumstances in Beall are remotely comparable to this case.

Indeed, none of the Maryland cases that Appellant cites support a conclusion that

Kintop acted with gross negligence.  Bailey does not contend that Kintop violated any order

of a superior, or a statute or court rule in his 2013 application for warrant, and he correctly

stated Suspect Bailey's height and weight as reported to him by Ms. Sharper.  Although

the potential exists that individuals will suffer harm after a wrongful arrest caused by a

mistaken identity, the risk of serious harm under these circumstances is not so high that it

arises to the level of *Cooper*, in which the plaintiff was murdered while seated in the back

---

[8] The chase was initiated when Beall "overheard a call on his radio from an off-duty officer about a Mercedes convertible and a motorcycle 'chasing each other or racing each other' at about 100 miles per hour (m.p.h.) on Interstate 83 North (also known as the Jones Falls Expressway) in Baltimore City.  A second transmission related that other officers were able to stop the car, but not the motorcycle."  *Beall v. Holloway-Johnson*, 446 Md. 48, 57 (2016) (footnote omitted).

of a van right next to Supermax inmates without any security cages or other physical barrier between them for protection.

Moreover, some of the language in *Beall* favorable to finding gross negligence was disapproved in *Stracke v. Est. of Butler*, 465 Md. 407, 421–27 (2019) (also cited by Bailey) in which the Court of Appeals, in a split decision, narrowed the scope of what could be considered gross negligence. *Stracke* was a case involving paramedics responding to an emergency call:

> [O]ur opinion in *Beall* morphed the distinctions between simple and gross negligence by holding that "a legally sufficient case of ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." [*Beall*, 446 Md. at 64] . . . .
>
> We decline to further muddy this already unclear area of law. If in almost all instances where a plaintiff can prove negligence, and the case is submitted to the jury to consider gross negligence, then many first responders will be stripped of the protective shield that the immunity was intended to provide, forcing them to go through the entire litigation process when there is only evidence of simple negligence. This result runs contrary to the heightened threshold of gross negligence we have articulated[.]

*Stracke*, 465 Md. at 421–22.

The plaintiff in *Stracke* died of a heart attack in the emergency room right after his transportation by paramedics from home to the hospital, and his estate alleged the paramedics ignored his symptoms and complaints of pain in his chest both during the transportation and in the first 15-30 minutes after arrival while getting him inside and waiting for hospital staff to triage him. *Id.* at 414–17. The Court ultimately ruled against the plaintiff on the issue of gross negligence, and, applying a restrictive standard,

concluded that "there is not sufficient evidence to conclude that Petitioners *made a deliberate and conscious choice to not help* [the decedent] survive." *Id.* at 422 (emphasis added).[9]

Although the nature of the *Stracke* paramedics' responsibilities and the associated risks differ from those presented here, and involve different statutory immunities, we should not ignore the *Stracke* majority's more restrictive approach to defining gross negligence. Our chief takeaway from *Stracke* is its rejection of the notion that "ordinary negligence will frequently be enough to create a jury question of whether such negligence was or was not gross." *Id.* at 421. As we explain below, we hold that the circuit court erred in granting summary judgment against Bailey on his claim for ordinary negligence. We do not "morph" that conclusion into a decision that the count for gross negligence should also go to the jury. *Id.*

Bailey also contends that a claim for gross negligence was stated because Kintop acted with malice, "or at least some improper purpose or motive." He believes that because

---

[9] The Court further explained its decision:

> The mere fact that Petitioners inaccurately diagnosed and treated their patient does not elevate their conduct to gross negligence. "[W]e cannot equate a well-intended error in medical judgment—even if it costs the patient's life—with wanton and reckless disregard for the life of that patient." [*McCoy v. Hatmaker*, 135 Md. App. 693, 713 (2000)].
>
>             \*\*\*
>
> Petitioners assessed the patient, took his vitals, and promptly transported him to the nearest hospital within approximately seven minutes of first arriving on the scene.

*Stracke v. Est. of Butler*, 465 Md. 407, 426, 430 (2019).

Kintop was "reprimanded by the Court for his actions," he suffered embarrassment and acted with an improper motive.

To be sure, malice can support gross negligence. *See Wilson*, 339 Md. at 728 n. 5 (implied malice has been defined in the past as "'gross negligence' involving 'wanton or reckless disregard'"). The record, however, reveals no facts to support this allegation. First, Kintop received no reprimand by the court. Quite simply, the trial court directed that there be a warrant issued for the correct Bailey, and Kintop undertook steps he thought necessary to comply with that request. We do not agree with Bailey's speculation that the alleged facts show that Kintop was so embarrassed or chagrined by the court's directive as to suggest that he had malicious intent that would support gross negligence. There is not even an allegation that Kintop said anything or made any gesture that indicated an angry reaction to the trial court's directive.[10]

Bailey believes gross negligence "must be present" because Bailey suffered "the same injury and harassment" a second time—without pointing to any specific, concrete facts rising to the level of gross negligence. The confluence of circumstances leading to his second arrest do not transform Kintop's actions from possible negligence to gross negligence. We affirm the circuit court as to gross negligence against Kintop.

---

[10] We note that Kintop did not know how the trial court would rule when he applied for the 2013 Warrant. The trial court did not make its ruling in favor of Bailey in his first lawsuit until 2014, more than a year after Kintop applied for the warrant.

Bailey alleged in his complaint that Buchanan "owed a duty to [Bailey] to ensure that [his] identifying information was not used for the 2013 Arrest Warrant," discover the correct Bailey named in the 2013 Warrant, and correct the information entered in the system. He charged that she "knew there was not an individual named James E. Bailey [who] was 5'5" and 145 lbs. in the 'system'" but did not correct the error.

Buchanan stated in her deposition that she did not learn of the 2007 Warrant, 2010 arrest, or subsequent trial until after the 2017 arrest. She did not receive any reports on the earlier arrest or civil trial. Buchanan's primary connection to Bailey was verifying the name and date of birth on the packet that Mackall gave her. She did not know that there were two persons in the county named James Elmer Bailey until she was asked to verify the 2013 Warrant during the 2017 arrest. She then saw that there were two men named James Elmer Bailey in the system. Her failure to discover that there were two persons with the same name and birth date may have been careless, but it fails to rise to the level of gross negligence. We see no facts alleged in Bailey's complaint that show any reckless disregard—without knowledge of the coincidence, she cannot act in reckless disregard of potential that the wrong person will be arrested. *See Howard*, 239 Md. App. at 529 ("One cannot act in reckless disregard of consequences of which she or he is unaware."). There is no evidence of malice. Although we acknowledge that being arrested can be an experience fraught with fear, trauma, and risk, we cannot, within the confines of existing law, authorize an award for gross negligence—perhaps the most serious of all torts—in every instance of error by a municipal employee who has contact with the warrant process.

Bailey's complaint cites the exact same reasoning for Mackall as Buchanan. Mackall was not employed by the Annapolis Police Department in 2007 or 2010. She became a Police Records Specialist in September 2013, after the issuance of the 2013 Warrant. Mackall stated in her deposition that she did not have any knowledge of Bailey's trial or its connection to Kintop. She did not enter the information about Suspect Bailey into InPursuit—she just entered the information she found into the NCIC database. Because the warrant was already entered, "all [she] checked was the name and date of birth." She had no knowledge of the 2007 Warrant. She merely verified the name and date of birth of the warrant, as she does with any other warrant. For the same reasons we applied to the claim against Buchanan, we affirm the circuit court's dismissal of the gross negligence claim against Mackall.

Bailey uses the same allegations for Lane as against Buchanan and Mackall. She had no prior knowledge of Bailey's first arrest in 2010. Up until the lawsuit, she was unaware of a majority of the circumstances surrounding the 2007 Warrant and the 2013 Warrant. Her participation was limited to verifying that the warrant was still active, and then contacting other parties when the Maryland Transportation Authority officers questioned the warrant's discrepancy on race. She was the one who notified the Maryland Transportation Authority that Bailey was not the subject of the warrant. Although after the fact Lane expressed frustration about her added work to fix the mix-up, rather than considering Bailey's greater embarrassment and inconvenience, the law of torts, especially gross negligence, is not designed to control self-centered actions that have no consequences. We see no allegations sufficient to allege gross negligence.

Based on Bailey's lack of cognizable allegations against Buchanan, Mackall, and Lane demonstrating grossly negligent conduct, we affirm the circuit court on this count.

## Ordinary Negligence And Public Duty Doctrine

*Discretionary v. Ministerial*

Bailey also alleges that Kintop's[11] actions involved with the 2013 Warrant were negligent—a lower threshold than our requirements for gross negligence.[12] His complaint stated that Kintop "owed [Bailey] a duty of care to ensure the proper and correct information regarding James Elmer Bailey was used for the 2013 Arrest Warrant," and that Kintop breached this duty. The circuit court granted summary judgment in favor of

---

[11] Bailey sued Buchanan and Mackall for negligence as well; we address those claims next.

[12] To successfully state a claim for negligence, a plaintiff must allege "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted form the defendant's breach of the duty." *Evergreen Assocs., LLC v. Crawford*, 214 Md. App. 179, 186–87 (2013) (cleaned up).

Appellees on grounds that "[p]ublic officials are entitled to qualified immunity from negligence claims."[13]

In order to prevail under either a statutory or common law immunity defense, the official must be acting in a discretionary capacity and not be grossly negligent or act with malice. *See Lee v. Cline*, 384 Md. 245, 258 (2004) ("The Maryland public official immunity doctrine is quite limited and is generally applicable only in negligence actions or defamation actions based on allegedly negligent conduct."); *Ashburn v. Anne Arundel Cnty.,* 306 Md. 617, 622 (1986)) ("[T]he actor will be relieved of liability for his *non-malicious* acts where: (1) he is a *public official* rather than a mere *government employee or agent;* and (2) his tortious conduct occurred while he was performing *discretionary,* as opposed to *ministerial,* acts in furtherance of his official duties." (emphasis in original)). *See also Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 137 (2000). We address both the questions of whether the Appellees were public officials and acted with discretion.

_____

[13] The Appellees do not identify the source of their claimed immunity—which could be common law or statutory. Maryland Code (1973, 2020 Repl. Vol.), § 5-507 of the Courts & Judicial Proceedings Article ("CJP") provides in pertinent part: "An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." Common law immunity could also be applicable. *See* CJP § 5-303(d) ("Notwithstanding the provisions of subsection (b) of this section, this subtitle does not waive any common law or statutory defense or immunity in existence as of June 30, 1987, and possessed by an employee of a local government."); *Howard v. Crumlin*, 239 Md. App. 515, 526 (2018) ("Public official immunity protects public officials—including police officers—who perform negligent acts during the course of their discretionary, as opposed to ministerial, duties.")

Bailey contends this was a misapplication of the doctrine of public official immunity. He argues that Kintop's actions in applying for the 2013 Warrant were ministerial rather than discretionary, and ministerial actions are not entitled to public official immunity.[14] Appellees respond that Kintop's actions were purely discretionary, and thus shielded by public official immunity.

We review "without deference a trial court's application of common law public official immunity." *Cooper*, 443 Md. at 713. Common law public official immunity "applies to public officials . . . who perform negligent acts during the course of their discretionary (as opposed to ministerial) duties." *Id.* (cleaned up). Further:

> The term discretion denotes freedom to act according to one's judgment in the absence of a hard and fast rule. When applied to public officials, discretion is the power conferred upon them by law to act officially under certain circumstances according to the dictates of their own judgment and conscience and uncontrolled by the judgment or conscience of others.

*Id.* (quoting *Livesay v. Baltimore Cnty.*, 384 Md. 1, 16 (2004)). We do not look to see if there was just *any* discretion, "but whether the act involves an exercise of the officer's personal judgment that includes, to more than a minor degree, the manner in which the police power of the State should be utilized." *Howard*, 239 Md. App. at 527 (cleaned up) (citing *James v. Prince George's Cnty.*, 288 Md. 315, 327 (1980)).

The Court of Appeals addressed the distinction between discretionary acts and ministerial acts in *D'Aoust v. Diamond*, 424 Md. 549 (2012). There, an appellant

---

[14] Bailey also raises a constitutional challenge to the warrant, but did not raise this challenge in the earlier proceedings. We decline to review this unpreserved issue. *See* Md. Rule 8-131(a).

challenged the application of qualified immunity to court-appointed trustees in the judicial sale of a condominium. *Id.* at 560. The Court began by recognizing the purpose underlying public official immunity: "the injustice of subjecting to liability an officer who is legally required to exercise discretion, particularly absent bad faith, and . . . the danger of deterring willingness to exercise judgment with decisiveness posed by the threat of liability." *Id.* at 586–87 (cleaned up).

The Court considered the Restatement (Second) of Torts' commentary "indicating that 'ministerial acts are those done by officers and employees who are required to carry out the orders of others or to administer the law with little choice as to when, where, how or under what circumstances their acts are to be done.'" *Id.* at 589 (citing Restatement (Second) of Torts § 895D cmt. h) (cleaned up). The Court also cited respected treatises: "Prosser has asserted that discretionary acts are those 'requiring personal deliberation, decision and judgment,' while ministerial acts are those 'amounting only to an obedience to orders, or the performance of a duty in which the officer is left no choice of his own.'" *Id.* (citing William L. Prosser, *Handbook of the Law of Torts*, § 132 at 988–89).

In *D'Aoust* the Court held that the defendants, trustees in a judicial sale, were not public officials and therefore had no immunity. Although not essential to its holding, the Court went on to correct what it considered to be an error made by the Court of Special Appeals in ruling that the trustees prevailed because they had immunity and their negligent acts, although ministerial, were nonetheless immune because they were included within a group of discretionary actions. *D'Aoust*, 424 Md. at 593–96.

In *Howard v. Crumlin*, we looked at the delineation of ministerial versus discretionary action involving an officer's "alleged failure to investigate further" after receiving a 911 call. *Howard*, 239 Md. App. at 527. Although the appellant alleged that the officer's level of investigation was ministerial, we disagreed: "[t]hat action—a police officer's determination regarding what degree of action or investigation might be necessary in responding to a particular situation—is a paradigmatic case of an action involving the exercise of personal judgment in determining the manner in which the State's police power will be utilized." *Id.* We held that the officer's level of investigation was "thus discretionary, not ministerial." *Id.* at 528.

Bailey asserts that Kintop's application for the 2013 Warrant was ministerial because, at the 2013 trial, the court expressed its desire for the 2007 Warrant to be recalled, and all of Kintop's actions after that were "absolute, certain, and involving merely the execution of a set task." The court specifically stated that it would "ask [the administrative commissioner] to strike the [2007] warrant and reissue with the correct information so that [Appellant Bailey] doesn't get picked up, or if he does get picked up . . . as long as he's still 6'1" [and 195 pounds] he'll be okay[.]" Bailey argues that "nothing was left to Sgt. Kintop's judgment or discretion . . . [and] therefore Sgt. Kintop's actions cannot be protected by statutory or common law public official immunity." In his deposition, Kintop testified that a judge told him "to issue another warrant for James Elmer Bailey."[15]

---

[15] Bailey's complaint alleged, in Count I, inter alia, that (i) "[Kintop] used the same . . . information for the 2013 Arrest Warrant as was used for the 2007 Arrest Warrant despite knowing the James Elmer Bailey stated in the 2013 Arrest Warrant was not the Plaintiff;" (ii) "he failed to correct the identifying information for the 2013 Arrest

Following that directive, according to Kintop, he generated the Statement of Charges that were signed by a Commissioner.[16]

In granting summary judgment for Appellees on the negligence count, the circuit court found "that Sergeant Kintop's actions were purely discretionary as opposed to ministerial." It found that his "actions and/or inactions, relating to investigating the claims of the complaining witness and deciding which information to include in the 2013 Arrest Warrant, were in accordance to his own judgment." We agree that any actions Kintop took regarding investigation and his choice of incriminating facts to include in the 2013 application for warrant were discretionary. Yet a close examination of *D'Aoust* and other cases instructs us that the discretionary shield is not impenetrable.

The Court of Appeals in *D'Aoust* overruled the Court of Special Appeals in its determination that in assessing whether a public official's actions could be ministerial, a so-called "nesting approach" applied, under which any ministerial acts "are subsumed

Warrant[;]" (iii) "he failed to take reasonable steps to discover and use the correct information for [Suspect Bailey][;]" and (iv) "in other ways [Kintop] was negligent."

[16] Bailey's memorandum in opposition to summary judgment emphasized how Kintop was following judicial direction in taking the steps to obtain the 2013 warrant:

> Defendant Kintop was **required** to further investigate the claims and the individual set forth by Kim Sharper's complaint. Defendant Kintop was **required** to swear that the information contained in the Statement of Probable Cause and the Application for Statement of Charges were true and accurate. Defendant Kintop did not investigate further the claims by Kim Sharper, and he swore to information that he **knew** was incorrect. These were not discretionary acts, but fall under the umbrella of ministerial acts.

within the broader judicial function of the" public official, thus entitling them to immunity.

*D'Aoust*, 424 Md. at 595.  In the High Court's words,

> [T]his Court has consistently upheld the distinction between discretionary and ministerial acts in its application of the qualified public official immunity doctrine . . . .  In the context of public official immunity, we find no compelling reason to depart from Maryland precedent, which indicates that the distinction between discretionary and ministerial acts is an important one.  The clear purpose of such a distinction is to allow public officials the freedom to make discretionary decisions according to their best judgment, without undue influence from a fear of personal liability . . . . There is no similar need for protection when performing actions that are strictly mandatory and for which no discretion is involved. In these situations, public officials are appropriately held personally liable if their conduct is not in accordance with the applicable rules or instructions governing the functions they are performing.

*Id.* at 595–96.

With *D'Aoust* as our guide, we next determine whether any alleged conduct of Kintop that Bailey relies upon could be considered ministerial, and therefore unprotected by the doctrine of public official immunity.  Bailey argues that Kintop's actions became ministerial after the District Court civil case brought by Bailey against the City for his first arrest:

> Once Sgt. Kintop received the directive from Judge McKenna, Sgt. Kintop's actions were absolute, certain, and involving merely the execution of a set task. Sgt. Kintop's compliance with Judge McKenna's directive was mandatory, amounting only to obedience to orders.

Except for cases involving operation of a motor vehicle,[17] *Hines v. French*, 157 Md. App. 536 (2004) —cited by Bailey—is the only notable instance that a Maryland appellate court has determined a police officer's action was ministerial rather than discretionary.

In *Hines*, a plaintiff alleged that she was injured when a police officer ("Officer 1"), knowing she recently had TMJ surgery, slammed her face against a vehicle in the course of an arrest. *Id.* at 546. She sued Officer 1 as well as another officer ("Officer 2") who was assigned to internal affairs and responsible for accepting complaints about police officers and referring them for investigation. *Id.* at 547. Refusing to recognize public official immunity to Officer 2, we said that "[Officer 2's] duties in taking complaints prior to forwarding them for investigation were clerical in nature and involved no exercise of judgment or requirement to make decisions or choices." *Id.* at 567.

Some cases outside of Maryland are closer factually to the case at hand. In *Soderlund v. Merrigan*, 955 A.2d 107 (Conn. App. 2008), the plaintiffs claimed that the defendant police had an obligation to destroy all records of their arrest because a court had directed that the arrest warrant be vacated, and the defendants failed to do so. *Id.* at 109. Connecticut's rationale for distinguishing between discretionary and ministerial acts by

---

[17] *See Prince George's Cnty. v. Brent*, 414 Md. 334, 356 (2010) ("[O]rdinarily the operation of a vehicle by [anyone], including a 'public official,' is a mere ministerial act.").

public officials is similar to Maryland's.[18]  Applying that standard, the Court examined

whether the officer had discretion when a judge directed that a police officer vacate an

arrest warrant:

> We are faced with an issue of first impression in Connecticut,
> namely, whether a judge's direction to a law enforcement
> officer not directly responsible to the judicial authority has the
> same legal effect as a judge's direction to a judicial employee.
> We conclude that on the basis of the narrow facts of the present
> case, a judge's order to vacate an arrest warrant is mandatory
> even upon a police officer.

*Id.* at 114.  It rejected the officer's claimed immunity:

> Police officers are protected by discretionary act immunity
> when they perform the typical functions of a police officer.
> Nevertheless, under the facts of this case, when a law
> enforcement officer has been ordered by the court to vacate an

---

[18] Connecticut explains the rationale for public official immunity as follows:

> [O]fficials are immunized from liability for negligence arising
> out of their discretionary acts in part because of the danger that
> a more expansive exposure to liability would cramp the
> exercise of official discretion beyond the limits desirable in our
> society[.]  Discretionary act immunity reflects a value
> judgment that—despite injury to a member of the public—the
> broader interest in having government officers and employees
> free to exercise judgment and discretion in their official
> functions, unhampered by fear of second-guessing and
> retaliatory lawsuits, outweighs the benefits to be had from
> imposing liability for that injury[.]  In contrast, municipal
> officers are not immune from liability for negligence arising
> out of their ministerial acts, defined as acts to be performed in
> a prescribed manner without the exercise of judgment or
> discretion[.]  This is because society has no analogous interest
> in permitting municipal officers to exercise judgment in the
> performance of ministerial acts[.]

*Soderlund v. Merrigan*, 955 A.2d 107, 112 (Conn. App. 2008) (cleaned up).

arrest warrant, the broad protections of discretionary act
immunity do not apply.

*Id.* at 114–15.[19] The reasoning of the Connecticut case suggests that like the officer there,

Kintop—because he was directed by the court to take certain action regarding a

warrant—may have been performing ministerial acts, which were not protected by public

official immunity.

Texas also decided a warrant case involving a plaintiff who was arrested after her

warrant was dismissed:

> The lawsuit grew out of a traffic citation issued to Mrs. Boone
> by a Bexar County Deputy Sheriff. Mrs. Boone alleged in her
> petition that she appeared before a justice of the peace who
> informed her that the case was dismissed and wrote
> "dismissed" on her citation. Approximately ten months later
> appellant Baeza appeared at Boone's residence. She arrested
> Boone on a warrant based on the prior citation, refused to
> consider Boone's explanation about the dismissed citation, and
> transported her to jail where she was booked and incarcerated.
> At no time was Boone allowed to appear before a magistrate.

*Copeland v. Boone*, 866 S.W.2d 55, 56 (Tex. App. 1993). The appellate court rejected the

police officer's defense of immunity as discretionary acts of a public official:

> To demonstrate that she acted in good faith, she argues that an
> officer with a warrant has a clear duty to arrest the person
> named in the warrant. It is not her responsibility to determine
> whether or not the order of arrest was wrongfully issued. This
> argument does not describe acts that are quasi-judicial or

---

[19] For more recent Connecticut cases, see *Borelli v. Renaldi*, 243 A.3d 1064, 1071 (Conn. 2020) ("Because we conclude that the applicable provisions require officers to exercise judgment in determining whether to pursue a fleeing motorist, we conclude that the trial court correctly determined that the duty imposed is discretionary."); *Cole v. City of New Haven*, 253 A.3d 476, 491 (Conn. 2020) ("[W]e conclude that the trial court improperly granted the defendants' motion for summary judgment on discretionary immunity grounds.").

> discretionary in character. These acts required no deliberation, only obedience to orders of the court. They describe the performance of the duty as to which Baeza was left no choice of her own.

*Id.* at 57. Like *Soderlund*, *Copeland* instructs that certain duties of a police officer regarding warrants are ministerial, and therefore not entitled to the protection of public official immunity.

The above cases from Connecticut and Texas are instructive and consistent with Maryland law regarding discretionary and ministerial actions by police officers. Applying a similar rationale to those cases, we hold that the allegations in the amended complaint cover both discretionary and ministerial actions by Kintop. His decision whether to interview Sharper again, and his decision to add new charges are discretionary actions falling within the public official immunity, absent malice. But his decision about the proper method to identify James E. Bailey and minimize any chance that the wrong man would be arrested a second time was not discretionary—because the judge had directed that a new warrant be issued so that the proper Bailey (Suspect Bailey) would be arrested instead of Appellant.

In response to the Motion for Summary Judgment, Bailey provided an affidavit from Joseph Blaettler, a 32-year police veteran, who held progressive positions of responsibility. Mr. Blaettler opined, inter alia, that "[b]ased on Sergeant Kintop's knowledge and the unique facts and circumstances of this case, Sergeant Kintop had a duty and an obligation to conduct a further investigation into the . . . identity of the individual described by Ms.

Sharper" and to "seek guidance from his superior, and ultimately explain the situation to the commissioner prior to swearing out another warrant."

We hold that Bailey's allegations, supported by Blaettler's affidavit, are sufficient to survive a summary judgment motion on his cause of action for negligence in the performance of ministerial duties by Kintop. The Blaettler affidavit is consistent with our belief, mentioned above, that being arrested is an experience fraught with fear, trauma, and risk. The affidavit also reflects that the power given to Commissioners to issue warrants for arrest and to police officers to apply for and present those warrants is a formidable power that must be exercised only with careful adherence to a fair process.[20] Because one mistaken arrest had occurred—arising from the identity of names and birth dates—it was incumbent on Kintop to exercise care in his duty to protect against that mistake happening again.

Assuming the alleged facts, including the substance of the Blaettler affidavit, were introduced into evidence, it would be reasonable for a jury to conclude that Kintop should have been aware of the several available databanks available to police, including motor vehicle information, and that mistaken information could be drawn from these databanks (as it was here). It is sufficient to prove that if Kintop did not know how to add something to his application for warrant that would flag the risk of a second mistaken identity because

---

[20] To be sure, warrants and arrests often must be expedited. But this was a situation in which the alleged crime had been committed six years earlier, and the wrong man had already been arrested because his name, date of birth, and county were the exact same as those belonging to Suspect Bailey. So, speed was not an issue—there was sufficient time for Kintop to consult his superiors and the Commissioner about an effective way to achieve what the judge ordered.

of identical name and date of birth, then, as the Blaettler affidavit asserts, he could have consulted his superiors. We conclude that the Blaettler affidavit is sufficient to create a material dispute of fact regarding whether Kintop had an obligation to take action—such as including a notation on the application—that gave notice to law enforcement personnel, including police officers dealing with the warrant down the line, that two persons with the same name and same birth date lived in the area, and one had already been erroneously arrested.

For these reasons we shall vacate the circuit court's decision to grant summary judgment against Bailey on the negligence count against Kintop and the City on the grounds that he was acting in a discretionary capacity and therefore immune.[21] We shall remand to the circuit court for further proceedings on this issue consistent with this opinion.

*Special Relationship*

Kintop also argued below that he is not liable in negligence because a police officer has no duty to an individual, but only to the public at large. This is known as the public duty doctrine. *See Fried v. Archer*, 139 Md. App. 229, 247–48 (2001). Bailey countered below that the exception to the public duty doctrine applies—when a special relationship is created between the plaintiff and the police officer. *See, e.g., Howard*, 239 Md. App. at 523.

---

[21] Bailey also argued that even if Kintop's actions were discretionary, he was ineligible for public official immunity because he acted with malice or an improper purpose. Because we hold that Kintop's actions were ministerial, and thus not protected by public official immunity, we need not address Bailey's allegations of malice.

Both arguments are interesting but ultimately not pertinent to this appeal. The circuit court did not grant summary judgment on grounds that Kintop had no duty to Bailey. Although the parties argue the existence, *vel non*, of the special relationship exception, the judge in the circuit court did not enter summary judgment on this ground. "[A]n appellate court ordinarily may uphold the grant of a summary judgment only on the grounds relied on by the trial court." *Ashton v. Brown*, 339 Md. 70, 80 (1995). *See, e.g., Gross v. Sussex Inc.*, 332 Md. 247, 254 n. 3 (1993); *Beckenheimer's Inc. v. Alameda Assocs. Ltd. P'ship*, 327 Md. 536, 545 n. 5 (1992). Thus, we do not address the question of whether a special relationship may have existed between Bailey and Kintop. This should be the subject of further proceedings in the circuit court on remand.

*Negligence—Buchanan and Mackall*

Finally, Bailey asserts that the circuit court erred in its decision to grant summary judgment in favor of Buchanan and Mackall on grounds that they owed him no private duty in tort under the public duty doctrine. *See Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 486 (2002).[22] Under this doctrine, "absent a special relationship between a [municipal employee and a member of the public needing public services], an employee does not owe such an individual a private duty in tort." *Id.* at 486.

---

[22] The circuit court was brief in its analysis of this point, simply saying: "[T]here is insufficient evidence upon which the jury could reasonably find Defendants Buchanan and Mackall owed Plaintiff a special duty to ensure the proper and correct information was used for the 2013 Arrest Warrant." It also reasoned that because the City of Annapolis was entitled to raise the public duty doctrine as to its employees, summary judgment in its favor would be entered.

Bailey must establish duty: "a defendant cannot be held negligent if she did not have a duty to the plaintiff." *Fried*, 139 Md. App. at 262. We have used the special duty rule for police dispatchers and related personnel to analyze whether the situation "justifies the imposition of a private duty of care toward [the] victim." *Id.* at 243. The special duty rule "requires a showing that the affirmative act of the defendant induced the victim's specific reliance upon the defendant's protection." *Id.* at 265 (emphasis omitted) (cleaned up) (citing *Ashburn*, 306 Md. at 631). That victim's "reliance is as critical in establishing the existence of a 'special relationship' as is the municipality's voluntary affirmative undertaking of a duty to act." *Id.* at 266. We held that "proof of such reliance is critical to creating a private tort duty, because detrimental and reasonable reliance on the promise of . . . assistance connects the defendant's conduct to the plaintiff's injury." *Id.*

*Fried v. Archer* arose out of heartbreaking circumstances; teenager Tiffany Fouts drank at a party, was sexually assaulted, and left for dead in the woods. *Id.* at 236–37. One of the party guests called the sheriff's department and reported to Kim Archer that Fouts was lying in the woods near an address that did not exist, but was close to the actual address. *Id.* at 237. Archer said that she would "send someone out." *Id.* Officers attempted to find what they believed was the intended address, but they were unable to find Fouts before her untimely death. *Id.*

Fouts' mother sued, alleging a special duty on the part of Archer and James Terrell, the chief of the county's Emergency Management and Operations Division. *Id.* at 240, 265. We noted that it was "undisputed that [Fouts] did not detrimentally rely on Archer's promise to 'send someone out.'" *Id.* at 266. Fouts had no awareness of any call to the

sheriff's department, or of any promise to send someone out. *Id.* at 267. She "did not detrimentally rely on a promise of police assistance." *Id.* We also acknowledged that the caller did not justifiably rely on Archer's promise either: "assailants who request help on behalf of their victim cannot 'justifiably' rely on a generalized promise to send an officer in deciding to leave their victim in the peril that they created." *Id.* at 274–75. We declined to impose a special duty on Archer.

As for Terrell, Fouts' mother alleged that he had a special duty based on "the foreseeability of harm resulting from a potential failure to establish proper policies, procedures and safeguard with respect to the training of emergency dispatch operators." *Id.* at 276–77 (cleaned up). She failed to allege that Fouts "or her assailants specifically relied on Terrell's allegedly insufficient training and procedures." *Id.* at 277. We again declined to impose a special duty, and thus found no cause of action for negligence.

The imposition of a special relationship often comes from an express offer of assistance. In *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101 (2000), the Court of Appeals addressed whether a special relationship existed after an officer made specific promises of protection to a victim of domestic violence. *Id.* at 107–09. Gerald Watkins assaulted his girlfriend, Valerie Williams. *Id.* at 109. She called her mother, Mary Williams, who came over and notified the police. *Id.* at 109. Officer Edward Colbert arrived at the scene; Watkins called, threatening to return to the house. *Id.* Colbert purportedly told both Williams women to stay in the house while he wrote up the report. *Id.* at 109–110. Later, Valerie Williams informed her mother that Watkins recently threatened to kill her. *Id.* at 110. Mary Williams then went to inform Colbert, who was no

longer in front of the house. *Id.* At that very moment, Watkins arrived; he shot Mary Williams in the leg, fatally wounded Valerie Williams, and then killed himself. *Id.*

Mary Williams sued Colbert; the circuit court granted summary judgment in favor of Colbert, and the Court of Special Appeals affirmed. *Id.* at 107. The Court of Appeals reversed, holding that "under the peculiar circumstances testified to by Mary Williams, there may be a genuine dispute of material fact concerning whether a special relationship existed between the two parties, thereby creating a duty of protection on the part of Officer Colbert." *Id.* at 141. Further: "While the officer may have had no duty to remain, if in fact he told Mrs. Williams that he would remain to protect them, he may have created a special relationship . . . creating a duty either to remain or to inform them that he was leaving." *Id.* at 150–51.

Bailey fails to allege any voluntary affirmative undertaking of a duty to act—his allegations merely reiterate Buchanan and Mackall's job duties, which they perform for public benefit, and imply that two women had special knowledge about his prior arrest. But both Buchanan and Mackall deny any knowledge about his 2007 arrest, and Bailey alleges no facts to support this implication.

Further, he fails to allege any type of justifiable reliance on their actions beyond what an average citizen expects from police department personnel. Nothing in the record suggests that he had a conversation with Buchanan and/or Mackall. Indeed, there was no awareness on Bailey's part that Buchanan and Mackall even existed before preparing his lawsuit, and thus no specific reliance on any actions that they took. To merely state that he relied upon this alleged special relationship "from at least the time of his first arrest and

the dismissal thereof to present day" without saying that he had communications with them that created a duty is just insufficient. Without pleading any specific, justifiable reliance or affirmative actions, Bailey failed to plead duty, and thus he had no cognizable claim for negligence against Buchanan and Mackall.

## CONCLUSION

We affirm the circuit court in dismissing Counts VIII–XII, and in entering summary judgment as to Count II. We reverse the court in granting summary judgment as to Count I and remand for further proceedings consistent with this opinion.

> **JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT HEREWITH. COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY APPELLEES.**